**CONTINENTAL INSURANCE COMPANY, Corvette Cover Underwriters 1993, Tugu Insurance Company, China Insurance Company, Protector Forsikring as, Oslo, Mitsui Marine and Fire Insurance Co., Ltd. Tokyo, FAI General Insurance Company Limited (Australia), New York Marine and General Insurance Co., Homestead Insurance Co., and Certain Underwriters at Lloyds, Plaintiffs,**

v.

**LONE EAGLE SHIPPING LTD. (LIBERIA), and The Royal Bank of Scotland PLC, Defendants.**

No. 94 CIV. 3306 (DLC).

United States District Court, S.D. New York.

Jan. 17, 1997.

---

John A.V. Nicoletti, Thomas M. Rittweger, Nicoletti Hornig & Sweeney, New York City, for Plaintiffs.

Terry L. Stoltz, Barbara Gonzalez, Burlingham Underwood L.L.P., New York City, for Defendants.

## OPINION

COTE, District Judge:

This is an admiralty action arising out of damage to the M/V ALPHA STAR ("ALPHA STAR"), a 21–year–old Ore/Bulk/Oil ("OBO") carrier, sustained during a voyage from Port Cartier, Quebec to Fos–Sur–Mer, France, in December 1993. Plaintiffs are various insurance companies which issued a time hull insurance policy to the ALPHA STAR. Defendant Lone Eagle Shipping Ltd. (Liberia) ("Lone Eagle") is the owner of

the ALPHA STAR, and defendant The Royal Bank of Scotland PLC ("Royal Bank") is the mortgagee of the vessel. Plaintiffs bring this action pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, for a declaration of nonliability on the policy for the ALPHA STAR's constructive total loss ("CTL"), and to recover money paid by plaintiffs to a salvor based on a theory of unjust enrichment. Defendants have counterclaimed for the value of the policy.

Following trial, this Court holds that the defendants have failed to prove that sufficient damage to the ALPHA STAR was caused by heavy weather to trigger the policy's coverage. Rather, plaintiffs have proven that a substantial amount of the damage was caused by advanced corrosion of the structure of the cargo holds of the vessel. Therefore, defendants have failed to show that a constructive total loss resulted from an insured peril. Finally, this Court holds that because the vessel was not endangered due to an insured peril, plaintiffs are entitled to recover the money paid to a salvor under a guarantee.

### I. *Background*

#### A. *Procedural History*

Plaintiffs filed this action on May 6, 1994, and subsequently filed an Amended Complaint dated August 31, 1995. In the Amended Complaint, plaintiffs allege (1) that the ALPHA STAR's loss was due to corrosion and wear and tear on the vessel rather than an insured peril such as a peril of the sea; (2) that the weather encountered by the ALPHA STAR during the voyage at issue was normal, expectable, and foreseeable, and therefore did not constitute a peril of the sea under the policy; (3) that defendants cannot prove that the damages to the ALPHA STAR were proximately caused by an insured event; (4) that the defendants cannot prove that the cost of repairing the ALPHA STAR would exceed $7,000,000, and thus the cost is insufficient to constitute a CTL; (5) that the defendants breached two separate implied warranties of seaworthiness; and (6) that the defendants were unjustly enriched by plaintiffs' payment to a salvage company of $159,000 for salvage expenses because plaintiffs are not liable for such a payment

under the policy. Defendants have counterclaimed for the value of the policy, $2,650,000.

At trial, pursuant to this Court's rules and with the consent of counsel, the direct testimony of all witnesses was presented by affidavit. Witnesses appeared at trial only for cross-examination and redirect testimony.

Plaintiffs presented affidavits from Robert A. Raguso, a weather expert; James L. Dolan, an expert in classification societies; Emanuel Silkiss, a metallurgical corrosion expert; George Petrie, a naval architecture expert; Paul Bartolo, an underwriter for the All American Marine Slip ("AAMS"); and Brian Sales, a claims manager for AAMS. Plaintiffs presented deposition excerpts from Bruno Storms, a surveyor from Comite d'Etudes et de Services des Assureurs Maritimes ("CESAM") who performed a survey of the ALPHA STAR in October 1993; Vassilios Roussopoulos, the Chief Mate of the ALPHA STAR; Petros Tsacaleris, Master of the ALPHA STAR; Stylianos Bithizis, Bosun of the ALPHA STAR; Mihail Karanikos, Chief Engineer of the ALPHA STAR; Alexandros Moshos, Second Engineer of the ALPHA STAR; Panagiatis Tzanetatos, Managing Director of the companies managing the ALPHA STAR; Paul Labrinakos, technical consultant and engineer for the companies managing the ALPHA STAR; Andre Fabiao, a court appointed hull surveyor for the Port Authority of Marseilles; Jacques Mordelle, CESAM surveyor; Johan Van Grieken, the surveyor hired by the ALPHA STAR's owner; Bernd Ustorf, the owner's claims adjuster; Thomas Dushas, chairman of one of the companies managing the ALPHA STAR; David Burbridge, an expert marine surveyor; and John Waite, an expert naval architect.

Defendants presented affidavits from Van Grieken, Ustorf, Dushas, and Anthony Amanatides, chief financial officer for Le Timon. Defendants presented deposition excerpts from Storms, Roussopoulos, Tsacaleris, Bithizis, Karanikos, Moshos, Tzanetatos, Labrinakos, Burbridge, Waite, Fabiao, Mordelle, Bartolo, and Sales.

At a trial held on January 6 through January 9, 1997, the following witnesses were

subject to cross-examination: Bartolo, Raguso, Dolan, Silkiss, Petrie, and Ustorf. Based on the testimony provided at trial and the exhibits admitted into evidence, following are the Court's findings of fact and conclusions of law.

## B. *Factual Background*

### *The Vessel*

The ALPHA STAR was an 841 foot long, 101,700 dead weight ton, 9–hold OBO carrier, built in 1972.[1] The vessel was constructed with double bottom tanks extending to side hopper tanks. The ship had 300 internal side shell structural frames which supported the external side shell plating between top side tanks and the lower hopper tanks. The frames are in effect the ribs of the vessel, while the plating is the skin of the ship. The frames are referred to as the web of the vessel.[2] Each cargo hold extended the entire width of the ship.

From the time of its construction until its purchase by Lone Eagle, the ALPHA STAR was classed with one of the thirteen of the world's thirty-nine classification societies who are members of the International Association of Classification Societies ("IACS"). Classification societies provide minimum standards addressed to the technical requirements for vessels during construction and throughout their service life. As of 1991, the ALPHA STAR was classed with the Det Norske Veritas Classification Society ("DNV"). DNV was and is a member of IACS.

In February 1991, Lone Eagle purchased the ship for $6,995,000, renamed her ALPHA STAR, and registered her in Greece. Following the purchase, the owners reclassed the vessel with the Hellenic Register of Shipping Classification Society ("HRS"). HRS has applied to IACS for membership but has been rejected. It is acknowledged by the parties in this matter that HRS has adopted standards for vessels that are very similar if not identical to those adopted by the members of IACS, but that HRS is criticized within the industry for employing inspectors who do not apply those standards with the rigor presumed to govern their enforcement by IACS member societies. At the time ALPHA STAR was reclassed with HRS, HRS did not have a worldwide network of competent surveyors working exclusively for HRS, a requirement for IACS membership. Nor did it have sufficient technical expertise on hand both to develop and apply classification standards. Following their purchase of the vessel, the owners immediately put a riding crew on board to conduct repairs and maintenance since the vessel was already over 18 years old.

The mortgagee of the ALPHA STAR was the Royal Bank. Olympic Shipping and Brokerage Agency ("Olympic") and Le Timon Transport Co. ("Le Timon"), which manage three other similar bulk carriers, were hired to manage the ALPHA STAR. Le Timon's U.S. agent is Dover Agency and Brokerage, Inc. ("Dover").

### *Insurance*

Lone Eagle's marine insurance broker in the United States was Rollins Hudig Hall ("RHH"). RHH applied to All American Marine Slip ("AAMS"), a slip of insurance underwriters led by Continental Insurance Co., for coverage for the four vessels managed by Olympic and Le Timon. On November 10, 1993, AAMS issued a Hull and Machinery Marine Insurance Policy for the ALPHA STAR, which provided insurance coverage from November 20, 1993 to November 20, 1994. The insurance rate for the ALPHA STAR was 4.2%; the premium $294,000. Older ships such as the ALPHA STAR pay higher insurance premiums because, among other reasons, insurance companies expect that they will have a certain amount of rust and corrosion. The policy

---

1. OBO carriers are distinguished from "pure" bulk carriers by the fact that OBO's are equipped to carry oil as cargo.

2. A frame, in cross section, is shaped like a "T." The top or horizontal line of the "T" is called the face plate of the frame and is parallel to the side shell plating; the stem of the "T" is the frame plate or the web of the frame. The bottom of the stem is welded to the side shell plating.

The frames were 8.8 meters in length, running from 7.2 to 16 meters above the baseline of the vessel. On the voyage at issue here, where the freeboard was 14.8 meters, 20.6 meters of the hull was submerged in still waters.

required that the classification society for all four vessels be changed from HRS to another classification society approved by AAMS no later than February 1994.[3]

For the heavy weather damage claim asserted here, the policy only provides coverage for a total loss or a CTL. The insurer did not provide coverage for partial loss due to heavy weather or a peril of the sea because it considered older vessels like the ALPHA STAR to be more susceptible to such damage. A CTL claim requires that Lone Eagle prove that the cost of recovering and repairing the ALPHA STAR would be at least $7,000,000. If a CTL is proven, the policy provides coverage of $5,000,000, with 53% being insured by the U.S. market with AAMS as lead underwriter, 20.4% insured through a line of French underwriters, and 26.6% being self insured. The underwriters' payment is minus the net scrap amount collected by the vessel interests, including the mortgagee, from the sale of the vessel to the ship breakers.

Payment in an amount below the valuation is known as a dual valuation clause. Again, this is customary for coverage of older vessels because of the difficulties in accurately valuing them.

The policy provides recovery for sue and labor expenses. Sue and labor expenses are those costs which the owner expends in order to take such reasonable measures as may be necessary to protect the vessel from loss or from a CTL due to an insured peril. This would include the costs associated with safeguarding and recovery of the vessel in order to prevent a total loss or a CTL.

*Structural Surveys*

The ALPHA STAR was on a "four" year survey cycle. Such a cycle includes a special survey at the beginning of the cycle, customarily has a "year of grace" survey at year four for older ships, and has the next special survey at year five. A special survey is a complete, in-depth review of the vessel. Within this cycle there are also annual sur-

veys and, at either year two or three, an intermediate survey.

The intermediate survey of an OBO, before enhanced survey requirements were adopted in 1993, required a close-up inspection of one or two cargo holds, with examination of additional holds and ultrasonic gauging at the discretion of the surveyor. A close-up inspection requires the surveyor to come close enough to the portion of the structure the surveyor is examining to be able to touch it. Ultrasonic gauging permits precise measurement of any diminution in the thickness of steel due to corrosion.

The year of grace survey requires the surveyor to enter every space on the vessel except the oil tanks, and to do the close-up survey and take the ultrasonic gaugings required for a special survey. As a consequence, this survey permits the repairs which will be required by the special survey to be done during the year of grace. When an OBO is twenty years old, gaugings must be taken of the interior and exterior of the vessel within three complete wide transverse bands of the vessel, as well as within two strakes or horizontal bands at the splash zone, certain other specified areas, and any suspicious areas.

On July 1, 1993, IACS issued enhanced survey requirements for vessels like the ALPHA STAR as a result of the extraordinary casualty record of recent years. Between 1989 and 1992, thirty-four OBO/bulk carrier casualties occurred and, when several vessels sank without a trace, cost more than 250 lives. Within the last ten years, more than 700 crewmen have died as a result of bulk carrier casualties. Many of the casualties occurred among older vessels, which are most prone to structural failure in their top side tanks, double bottom ballast tanks, and cargo holds. The IACS has recognized various factors as contributing to those casualties, the single most significant of which is wastage of the frames in the cargo holds from corrosion.

The ALPHA STAR's last special survey was conducted by DNV in 1989. The only

3. AAMS later extended the time for the other three vessels to be reclassified even though that request was made after the claim for the con-

structive total loss of the ALPHA STAR had been made.

ultrasonic gauging of the frames occurred in the forepeak. The survey found sufficient wastage to require the renewal or repair of many structural members, including frames in cargo holds 2 and 8—the holds where water entered during the period of heavy weather at issue here.

A DNV survey in October 1990 found more buckled side shell frames in some of the cargo holds and ordered a close-up survey to be done. A close-up survey in January 1991 included a close-up inspection of the top ends of the frames in certain cargo holds, but not cargo holds 2, 5 or 8. Where it was done, spot gauging indicated wastage of less than 10%.

An HRS structural survey in February 1991 related to the change of class noted no new structural deficiencies. The only structural deficiencies in the cargo holds that were commented on were those identified in the DNV October 1990 survey. The HRS surveyor described the buckled frames identified by DNV as "minor" damage and opined that repairs could be deferred. There is no indication that cargo holds 2, 5, or 8 were subject to any inspection. At the annual survey in March 1992, HRS conducted an internal survey of three holds (again, not holds 2, 5 or 8), and pronounced their condition good. During the 1993 annual survey, conducted in February, HRS entered holds 1, 2, and 5, and declared their condition good. No repairs were carried out as a result of the survey and no recommendations for repairs or testing were made.

On October 6 and 8, 1993, CESAM performed a condition survey at Amsterdam in order to decide whether to renew insurance coverage of the vessel. This was not a structural survey and no thickness gauge readings were taken of the frames in the cargo holds. An HRS surveyor who was also in attendance indicated, however, that he had made some ultrasonic thickness measurements of some portions of the vessel and that they were within allowed limits.

The CESAM surveyor only inspected four cargo holds, and since the cargo (soy beans) was on board at the time of the survey, he limited his survey to a brief inspection of the upper parts of those holds nearest the lad-

ders. With respect to the exterior of the hull, only approximately 25% of the hull surface of a fully laden vessel can be observed. As a consequence, this survey was of little assistance in assessing the allegation of damage from heavy weather later asserted by the vessel's owners. Nonetheless, the survey noted a generally rusted condition of the side walls and frames. Ultimately, the French underwriters agreed to continue coverage of the vessel but only for $1,000,000. The remainder of the coverage was, as described above, placed in the American market.

In October 1993, while the vessel was in Amsterdam, HRS conducted the year of grace survey. The survey was not as rigorous, however, as it should have been. For instance, no close-up inspection was conducted and no ultrasonic gaugings were taken of the framing in the cargo holds. Nonetheless, HRS granted the vessel a year of grace until its next special survey.

That same month, October of 1993, the vessel developed a crack in the No. 1 double bottom starboard side tank. The crack was repaired by an on-board riding crew of four welders. Although classification societies are supposed to be consulted regarding all structural repairs, the owners never advised HRS of this crack or the repair.

A crack in the No. 1 double bottom port side tank was noticed to be leaking at a rate of 5,000 gallons per day prior to the vessel's arrival at Dunkirk, France on November 17, 1993. Again, HRS was not notified. The crack was repaired by the riding crew in early December, after the Canadian Coast Guard independently discovered the crack.

In sum, as of the ALPHA STAR's fateful voyage in December 1993, no close-up inspection of the framing in all of the cargo holds had been done since 1989 and no ultrasonic gaugings of the framing in cargo holds 2, 5 and 8 had been taken since before 1989, if ever. In this and many other respects, the surveys undertaken since 1989 were not sufficiently rigorous to provide a reliable assessment of the structural soundness of the vessel. Had HRS carefully surveyed cargo hold No. 2 in February 1993 or each of the cargo holds during the year of grace survey in

October 1993, it would have found that the frames were so seriously diminished through corrosion that the vessel was no longer "in class."

### The Voyage

The voyage at issue here began at Port Cartier, Canada, where the ALPHA STAR loaded iron ore to be delivered to Fos–Sur–Mer, on France's Mediterranean coast. On November 26, 1993, as the vessel was en route to Canada to pick up its cargo, Dover sent the Master of the ALPHA STAR a telex describing the Canadian Port Authorities as "very strict" and "prejudiced".

On November 29, 1993, Dover underscored its warning with the following telex to the Master:

Nobody has the right to inspect areas of the ship to his discretion and without Masters [sic] approval. Master should not permit entrance of anybody in areas which he don't [sic] approve. Master should also have to arrange [sic] prohibit entrance in the areas he feels necessary by making random access impossible (e.g. by ballasting, or other technical undertakings). If any inspection is to be conducted by authorities then, the inspector must be continuously followed by ship's officer who if [sic] fully aware of all above.

As the Coast Guard officers stationed at Port Cartier approached the vessel in early December, they saw water leaking from one of the double bottom ballast tanks. They thereafter carried out a Port State Control Safety Inspection. Various deck cracks were discovered by the Canadian authorities and repaired by the on-board welders. The repairs were approved by an HRS inspector, who classified at least one of the repairs as permanent when he should not have done so. There is no indication that a close-up survey of the side shell framing was done by anyone.

On December 11, 1993, 99,046.28 metric tons of bulk iron ore concentrate were loaded into holds 1, 3, 5, 6, 7 and 9. The sailing draft of the loaded vessel was 48 feet, 7 inches. Holds 2, 4 and 8, as was customary, were left empty. When the vessel left Quebec on December 11, 1993, she carried a riding crew of four deck welders.

Between approximately December 16 and 18, while crossing the North Atlantic, the Chief Mate discovered four cracks in the port side shell plating in hold No. 2 and approximately ten to twelve structural frames in the hold were found buckled. At that point of the voyage, the port side of the vessel was also the leeward side, which meant that the wind was on the starboard side. Two of the ten frames were also detached from the side shell plating in way of the hold. Approximately 10 centimeters of water, which had entered through the cracks, was lying over three-quarters of the hold's tank top.

The Master of the vessel was immediately informed. The Master, who had joined the vessel in July 1993, had received no instructions from the owners about repairs or maintenance, but had instead been given a free hand with the vessel. The owners, who were also immediately informed of the situation, did not contact the classification society as they were required to do. Indeed, HRS was never contacted about this problem or those that were discovered over the succeeding days. Nor was it advised to arrange for an inspection at Gibraltar or Fos. The owners were well aware of their obligation to report any breach of hull integrity to the classification society but chose not to do so.

By December 20, an emergency inspection of the remaining eight holds had been completed and revealed buckled structural frames in seven of the other eight holds. There were detached frames in at least hold No. 5 as well. Only hold No. 4 appeared to be without a problem. The owners made arrangements for four additional welders as well as welding equipment and a superintendent engineer to board at Gibraltar.

Defendants contend that the additional riding crew, superintendent, and supplies were put on board in Gibraltar because it cost less to do it there, there was concern that it would be impossible to obtain supplies in France during the holidays, and the welders could erect scaffolding in holds 2 and 8 so that inspection and repair work could proceed more quickly when the vessel was in port. It would have been imprudent and dangerous to make riding repairs to the structure of a loaded vessel at sea and there

is no evidence that such repairs were made by the crew of the ALPHA STAR.[4]

The vessel stopped in the roads of the port of Gibraltar to take on the additional crew and supplies. If it had stopped in the port, it would have been subject to inspection by the Port Authority and if inspected the Port Authority would in all probability not have permitted the vessel, with a breach in its hull, to continue sailing. To enter the port and to repair the breach, the ALPHA STAR would have had to discharge a significant portion if not all of its cargo, which would have been a difficult, costly, and time consuming process. As the vessel left Gibraltar, however, the weather forecast warned of winds at Beaufort Force 6 to 7. The owners and Master were well aware of the risks they ran in continuing the voyage, but gambled that they could safely reach Fos, discharge the cargo, and then make the necessary repairs.

On December 23, 1993, the Chief Mate observed that the cracks in the side shell of the No. 2 hold had grown to approximately 12–13 centimeters. On December 26, 1993, at about 0130 hours, the vessel began to move off its course to Fos. At that time it was experiencing winds no greater than Beaufort Force 8 and a combined sea and swell no greater than 5 meters. At approximately noon, the Master ordered an inspection of holds 2, 5 and 8. Water continued to pour in from the port side shell plating cracks in hold No. 2 and three meters of water were on the tank top. Breaking and cracking noises were heard in holds 5 and 8 and water was found in hold No. 8. At approximately 1510 hours, the vessel sent an SOS message. The French Navy dispatched

two helicopters from Corsica and the crew was safely evacuated. Among those removed from the vessel was the wife of the Chief Officer.

The abandoned vessel continued to steam on auto-pilot toward Sardinia due to the fact that the vessel's propulsion engines and power plant were not effectively shut down.[5] On December 27, the French Navy helicoptered some of the officers and crew back to the ship in order to bring the vessel to a stop. The vessel was completely and safely evacuated again that same day.

While a vessel's logs are ordinarily a reliable source of significant information about a voyage, including the weather experienced, the ALPHA STAR's logs are not reliable. Entries made by the Master in the rough log for certain portions of the voyage before December 26 exaggerated the wind conditions slightly. On December 26, the Master recorded Beaufort Force winds of 11–12 (73–82 mph) after 10:30 a.m. These were excessively high and not substantiated by any other vessel in that part of the Mediterranean, government weather data, or any expert calculation. Indeed, I find that all of the entries in the vessel's log for December 26 contain exaggerated descriptions of the conditions encountered by the vessel. The ALPHA STAR's logs are particularly unreliable since the Master believed that the rough log was not an official record and that he was therefore free to omit entering its data into the smooth log and could add data to the smooth log that was not in the rough log. In addition, he added material to the rough log to conform it to entries that he decided to make in the smooth log.[6] Finally, as de-

---

4. A structural repair of a loaded ship at sea should never be done because the ship is under stress when sailing. Moreover, welding a frame onto shell plating in those conditions will inevitably create a crack on the inside of the hull. Finally, using a riding crew to make repairs while a vessel is in transit prevents the vessel's classification society from surveying damages, advising on the repairs, or approving repairs that have been made. Consequently it would violate a classification society's rules.

5. The emergency stop and the fuel oil bunker tank isolating trip valves failed to shut off when activated by the crew.

6. Plaintiffs argue that this Court should employ an adverse evidentiary inference against defendants because of the alleged altering of log books by the ALPHA STAR's Master and because the Master instructed his crew not to tell the truth during any investigation of the damage to the vessel. As stated by then-Judge Breyer,

When the contents of a document are relevant to an issue in a case, the trier of fact generally may receive the fact of the document's nonproduction or destruction as evidence that the party which has prevented production did so out the well-founded fear that the contents would harm him.

scribed below, the Master was determined to exaggerate the severity of the weather faced by the vessel as part of his scheme to conceal the deteriorated condition of the ALPHA STAR.

I find that the weather experienced by the vessel from its departure from Canada to have been the following:

From December 11 to 23, while the vessel was travelling between Port Cartier and Gibraltar, it experienced wind forces no greater than Beaufort Force 7 (32 to 38 mph), and combined significant sea and swell heights no greater than five meters. Until December 19, the winds were coming from the southeast, south, or southwest, striking the starboard side of the vessel. On December 21 at approximately noon, the wind began for the first time to strike the port side of the vessel.

From December 23 to 25, that is, from the time the vessel left Gibraltar to the day before being abandoned, the vessel experienced wind forces no greater than Beaufort Force 7 and a combined significant sea and swell height no greater than 3.9 meters. On December 26, the day the vessel was abandoned, it experienced wind forces no greater than Beaufort Force 9 and combined significant sea and swell heights no greater than 7.4 meters.

The world meteorological organization classifies Beaufort Force winds of 7 as near gale conditions and describes the sea associated with such winds as one in which the sea heaps up, with foam from breaking waves beginning to be blown in streaks. Force 9 winds are characterized as strong gale winds and are associated with high waves, a sea that begins to roll, and dense streaks of foam. All of these conditions were expectable weather at that time of year in the waters in which they were experienced by the ALPHA STAR and vessels like the ALPHA STAR which are "in class" are expected to

weather even more severe conditions without any structural failures. Indeed, the vessel is built to run in just such weather and conditions. Even with web corrosion of 25% there should have been no structural damage to the ALPHA STAR from the weather she experienced during this passage.

### The Veracity of the Crew

During the latter portion of his deposition the Chief Mate revealed that the Master had gathered the officers together after they had been rescued and instructed them not to tell the whole truth concerning what had transpired during the voyage from Port Cartier, in particular not to reveal that there had been any damage to the vessel before December 26 and that water had entered hold No. 2 during the voyage across the Atlantic. The Chief Mate admitted that he had, as a consequence, initially given false deposition testimony and had not told the truth when various authorities interviewed him about the voyage.

### December 31, 1993

Feronia International Shipping ("FISH"), a salvor under contract with the French Navy, managed to tow the abandoned vessel to an anchorage just outside the port of Fos–Sur–Mer. The vessel arrived at the anchorage of the port of Fos the evening of December 31. That evening Andre Fabiao, the Court Appointed Hull Surveyor for the Port Authority of Marseilles, boarded the vessel. Not long thereafter other surveyors, owner's representatives, and the Master boarded the vessel.

There were oxygen and acetylene tanks, cutting lines, and welding cables on the weather deck running into cargo hold No. 8, as well as new, pre-cut steel plates located near the cargo hold. The presence and position of these items indicated that the deck had never been submerged. An inspection of

---

*Nation–Wide Check Corp., Inc. v. Forest Hills Distributors, Inc.,* 692 F.2d 214, 217 (1st Cir. 1982). *See also Weinreich v. Sandhaus,* 850 F.Supp. 1169, 1181 n. 19 (S.D.N.Y.1994); *INA Aviation Corp. v. United States,* 468 F.Supp. 695, 700 (E.D.N.Y.), *aff'd,* 610 F.2d 806 (2d Cir.1979). There are two rationales for this rule. First is the "common sense observation" that when a party destroys evidence knowing that it is rele-

vant to a litigation, that party likely felt threatened by the evidence. *Nation–Wide Check Corp.,* 692 F.2d at 218. Second is the need for a penalty against the party who destroys evidence—a sanction which also has a deterrent effect. *Id.* Accordingly, I will take into consideration the fact that the logs have been altered when determining the reliability of the weather estimates contained therein.

the accommodations area did not reveal the disorder normally associated with a vessel that had encountered heavy weather. In the officers' mess a bottle and glasses stood upright on a tablecloth.

The door of the forecastle was open. Normally such a door is closed in order to prevent water from flooding the ship and affecting buoyancy. As a result of the open door, and an unbolted and removed manhole cover, the forecastle was flooded. There was no deformation of the main deck or the hatch coaming. The No. 2 hatch cover, however, was breathing and lifting heavily due to water entering through and retracting from breaches in the port side of the No. 2 hold. The attending surveyors told the owners' representatives and crew members to open various hatches to allow the hold to ventilate, to reduce pressure on the hatch cover, and to prevent damage to the hatch cover and surrounding deck. This advice was repeated on January 4, but ignored. Deck fittings such as walkway grating, electric cable and cable tray were detached from the deck.

On December 31, French Navy divers discovered that two large areas of side shell plating on the port side were torn in way of the No. 2 hold. One hole was approximately 3 meters by 4 meters and the second hole was approximately 6 meters by 4 meters. The breaches were open on three sides, with the plate folded back like a wing toward the aft of the vessel. The aft edge of these holes terminated at frames that had been replaced in their entirety during the DNV special survey in 1989. Despite these holes, the vessel was not in danger of sinking or breaking up. If it had been, the Port of Marseilles would not have allowed it to anchor where it did. The double bottom was supporting the ship and keeping it rigid. The ribs on board the vessel were, however, seriously corroded and substandard from long term corrosion.

### January 1 to January 5

On January 1, 1994, crew members reboarded the vessel in order to reestablish power and other vital services. On January 5, 1994, as weather conditions worsened, the four man crew on board since January 1 sent an SOS and were evacuated.

On January 5, vessel owners tendered a Notice of Abandonment to the underwriters. That same day, AAMS refused to accept the Notice.

### January 6 to February 2

On January 7, 1994, the French Navy cut the anchor chain and towed the vessel fifty miles offshore so that it would not sink in the entrance to the harbor. On January 8, Lone Eagle entered into a salvage agreement with Smit Tak International ("Smit Tak"), a professional salvor, in order to return the vessel to Fos anchorage.

On January 12, Smit Tak boarded the ALPHA STAR and began work to prepare the vessel to be brought back to port. They discovered that the main deck manhole covers had been left open. As a result, topside wing tanks 1, 2, 3 and 4 had filled with water and topside wing tank 5 was partly filled with water. The ship was much lower in the water and the weather deck was awash with water.

In addition, it was discovered that in the intervening days since the ALPHA STAR had been towed out to sea, the No. 2 hatch cover, forward coaming and adjacent deck area had collapsed and caved in. The crew had not acted to ventilate hatch No. 2 and the pressure from the movement of the water in and out of the vessel had finally done its damage.

On January 15, the vessel was brought into the Fos anchorage. On January 27, the vessel was brought into Fos Harbor and thereafter her cargo was discharged. Discharge was complete on February 1. Smit Tak's services ended on February 2.

### Financial Arrangements for Salvage and Sale

Before undertaking salvage efforts, Smit Tak required ALPHA STAR's owner to post security to ensure Smit Tak's payment. Lone Eagle claimed that it lacked the funds to pay Smit Tak. The cargo underwriters agreed to guarantee $300,000 to Smit Tak. On January 14, Smit Tak refused to undertake further salvage efforts unless the hull and machinery underwriters also agreed to guarantee $300,000. The U.S. underwriters agreed to a portion of that payment, $159,-

000, which was 53% of the $300,000—*i.e.,* the percentage of the U.S. underwriters' participation in the overall policy. Lone Eagle failed to pay Smit Tak, and Smit Tak collected from the guarantee money posted by the underwriters. The parties have stipulated that the FISH charges were $210,000, and that the Smit Tak charges were $341,000. The FISH charges were incurred prior to the notice of abandonment on January 5, 1994, and the Smit Tak charges were incurred after.

*Surveys*

On December 28, 1993, All American engaged the services of the London Salvage Association ("S.A.") to survey the vessel. David Burbridge attended the vessel on twenty-three days from December 31 to March 21 to conduct his survey for S.A. Although the owners at first refused to allow ultrasonic gauging readings to be taken, they were eventually done of the structures in holds 2, 5 and 8, and on the main deck.

Classification societies set limits, which may not be exceeded, for diminution in the thickness of the various structural members of vessels. If the limits are exceeded, a vessel is "out of class." For OBO's and bulk carriers those limits run between 15 to 30% depending on the area of the vessel. The maximum diminution allowed for the webs which support the shell of a cargo hold is 25%.[7]

The gaugings in the No. 2 hold revealed that the failed and defective shell frames were significantly thinner, with readings showing diminution of up to 67%; the diminution where the frames had failed was generally between 36% and 50%. The only frames not seriously affected were those that had been repaired or replaced due to the DNV special survey in 1989.

There was severe detachment of the upper ends of frames on the port side of hold No. 5. The lower portions of the frames in the hold showed diminution of approximately 20%, while the readings taken in the mid-portion

of some port-side frames were in excess of 30%.

In the No. 8 hold, where the frame plating had completely failed, the wastage was in excess of 50%. Readings at levels of 40% were not uncommon.

With one exception the measurements of the deck revealed no widespread thinning, although there was localized diminution in excess of 20%. At the starboard forward end of the No. 2 hold, however, the deck plating was up to 50% wasted.

Burbridge concluded that the failure of the ship's structure in the concerned cargo holds was the result of a loss of structural strength due to wastage by corrosion. The failure and defects to deck structures and fittings were also due to wastage. In his opinion, the failure of the No. 2 hatch cover, coaming and surrounding deck could have been avoided if the crew had ventilated the hold, as had been recommended. No severe deformation or misalignment of the vessel was apparent and no machinery damage had been sustained.

A Judicial Report of the Tribunal de Commerce of Salon–de–Provence, issued after receipt of a detailed survey of the stricken vessel, expert reports, and related documents, concluded that the breaches in the hull of the vessel were due to advanced corrosion that long preceded December 26, 1993. The Report highlighted the deficiencies in the surveys conducted since 1991, in particular the failure to make a complete examination of the frames and other suspected corrosion zones. The experts reporting to the tribunal concluded that during the weeks or even months that preceded December 26, the ALPHA STAR did not meet the minimum standards of seaworthiness with regard to hull structures. Thus, the weather encountered on December 26 was not "a determining factor, but rather merely revealed the weakness of the structures."

When considered as a whole, the evidence at trial established that the ALPHA STAR

---

7. The original internal structural frame plate thickness for all the cargo holds, as built, was 11.5 mm.

As noted above, no ultrasonic gauging of the frames in cargo holds 2, 5, or 8 had been taken in 1989, at the time of the last special survey, or at any time thereafter until Burbridge took his readings in 1994.

was in generally poor structural condition with heavy scale on the exposed steel and serious structural weaknesses in way of the cargo hold side shell plating and in the internal framing. Frames with the wastage evident in cargo holds 2, 5 and 8 are likely to suffer detachment or buckling. That detachment and buckling was clearly evident in the ALPHA STAR's holds. With the extent of detached framing on the ALPHA STAR, side shell failure was inevitable. Indeed, the breaches in the shell of hold No. 2 were in way of frames that were unrenewed or only partly renewed in 1989 as a result of the October 1989 DNV survey. Both breaches terminated at frames that had been completely renewed in 1989. The severe deterioration in the steel structure of the ALPHA STAR and the holes in the port side of the vessel were caused by neglect over a substantial period of time.

Moreover, the pressure loads produced by the wave conditions encountered by the ALPHA STAR on its voyage from Canada would not have caused the structure of the ALPHA STAR to fail if it had been sound, even with a 25% reduction in its frames. In contrast, the effect of 50% wastage of the web was virtually certain to lead to buckling in the web of the frame, which would leave the shell plate effectively unsupported.

Johan Van Grieken, who surveyed the vessel for the owners, attended the vessel for three days from January 30 to February 1. This was a preliminary survey and he was never called back by the owners to do a complete survey. Nonetheless, he was the only witness proffered by the vessel owners on the issue of causation. When given his assignment by the owners, Van Grieken was told that the damage to the vessel was due to heavy weather. He did not attempt to verify that as the cause; he simply limited his survey to identifying damage consistent with an allegation of heavy weather. Thus, he testified at his deposition, "[w]e are not searching for the truth. I am presenting the condition of the vessel and the repairs recommended to correct that condition. That's all I was hired for." Consequently, although he observed Burbridge measure the frames of the No. 2 hold at 3.6 to 4.5 mm (compared to

an as built measurement of 11.5 mm), he did not take that diminution into account in any analysis that he made. His testimony was effectively limited to observations of damage that "could" be the result of heavy weather or that was consistent with heavy weather damage, instead of being an expert opinion that the damage was in fact caused by heavy weather.

Van Grieken's survey was further limited by the fact that cargo was still on board the vessel during part of the time he was in attendance. Moreover, since cargo holds 2 and 8 both still had water in them, he was unable to walk around them and his observations were limited to standing on the access ladder. His analysis of the damage to the interior of the holds was thus based in large part on his examination of the outside of the hull and the deformities he observed to the shell plating.

### The Ship Was Sold for Scrap

The ALPHA STAR was eventually repaired sufficiently to sail to Along, India, where she was sold to ship breakers for $3,009,810. The parties have stipulated that the net scrap value received by the defendants was $1,533,749.64.

### Claim

On April 14, 1994, Lone Eagle submitted a claim to the Hull and Machinery Underwriters, led by AAMS, for Constructive Total Loss of the vessel due to heavy weather encountered on December 26, 1993. On May 6, 1994, AAMS declined the claim.

## II. Discussion

### A. Defendants' Prima Facie Case

In order to recover under the time hull insurance policy at issue in this case, the defendants must prove (1) that the damage to the vessel resulted from a peril covered by the policy; (2) that the covered peril was the proximate cause of the damage; and (3) that the vessel was a constructive total loss—that is, that the damage caused by the insured peril exceeded $7,000,000.

### 1. Peril of the Sea

■ In cases such as this involving a specific perils hull insurance contract, the in-

sured bears the burden of proving that the vessel was damaged due to a peril covered by the policy. *See Northwestern Mutual Life Ins. Co. v. Linard,* 498 F.2d 556, 561 (2d Cir.1974); *Darien Bank v. Travelers Indemnity Co.,* 654 F.2d 1015, 1019 (5th Cir.1981) (Unit B). The defendants concede that they must meet this burden.

In this case the defendants claim that the ALPHA STAR was damaged by heavy weather—a "peril of the sea." The phrase "peril of the sea" is a term of art in maritime insurance law. The primary requirement for a finding of the existence of a peril of the sea is that " 'damage be done by the *fortuitous* action of the sea.' " *New York, New Haven & Hartford R.R. Co. v. Gray,* 240 F.2d 460, 464 (2d Cir.1957) (citation omitted) (emphasis added), *cert. denied,* 353 U.S. 966, 77 S.Ct. 1050, 1 L.Ed.2d 915 (1957);[8] *Sipowicz v. L.R. Wimble,* 370 F.Supp. 442, 446 (S.D.N.Y. 1974). This approach, first announced by the Second Circuit in *Gray,*

> while clearly more expansive than the older, extraordinary occurrence test, is not all encompassing. The element of fortuity, a chance event or occurrence, an uncommon

and unanticipated happening must be present.

*Id.*[9] In sum,

> A loss is occasioned by a peril of the sea when it results from the fortuitous (unforeseen and unanticipated) action of the sea. A loss is not occasioned by a peril of the sea when it results from the defective, deteriorated or decayed condition of the vessel or from ordinary wear and tear.

*Id.* at 448. Another common articulation of the rule is that

> "When considering what was or was not a peril of the sea, ... the question was whether the loss arose from injury from without or from weakness from within and that what underwriters insured against were casualties that might happen, and not consequences which must happen."

*Compania Transatlantica Centroamericana, S.A. v. Alliance Assur. Co.,* 50 F.Supp. 986, 991 (S.D.N.Y.1943) (quoting *Ballantyne v. MacKinnon,* 1896, 2 Q.B. 455, 460).

With respect to a peril of the sea due to weather, the Second Circuit has made clear that heavy weather may be a peril of the sea even if it may have been foreseeable that the vessel would encounter severe

---

**8.** The *Gray* court went on to note, as an example, that, " '[f]or instance, where cargo was damaged by the incursion of seawater through a hold in a pipe gnawed by rats, the House of Lords held this to be a peril of the seas.' " *Gray,* 240 F.2d at 464 (citations omitted).

**9.** Plaintiffs cite *Thyssen, Inc. v. S/S Eurounity,* 21 F.3d 533, 538 (2d Cir.1994), for the proposition that proving a peril of the sea requires a showing that the weather conditions are "extraordinary," "irresistible," or "overwhelming." *Thyssen* and several of the other cases cited by plaintiffs, however, involve controversies between cargo owners, cargo carriers, and ship owners under bills of lading and based on the Carriage of Goods by Sea Act, which discusses "peril of the sea" within its statutory text. *See* 46 U.S.C.App. § 1304(2)(c). The Second Circuit has explicitly distinguished such cases, including several on which *Thyssen* relies such as *Duche v. Thomas & John Brocklebank Ltd.,* 40 F.2d 418 (2d Cir.1930) and *The Giulia,* 218 F. 744 (2d Cir.1914). *See Allen N. Spooner & Son, Inc. v. The Connecticut Fire Ins. Co.,* 314 F.2d 753, 757 n. 3 (2d Cir.), *cert. denied,* 375 U.S. 819, 84 S.Ct. 56, 11 L.Ed.2d 54 (1963). As the Second Circuit explained in *Arbib & Houlberg, Inc. v. Second Russian Ins. Co.,* 294 F. 811, 816 (2d Cir.1923),

The phrase "perils of the seas" occurs in bills of lading, where it is used as a ground of the carrier's exemption from liability, and it is also employed in policies of insurance in stating the ground of the insurance company's liability. In the interpretation of the phrase when used in bills of lading, the courts have adopted great strictness, as the carrier is seeking exemption from liability; but in the interpretation of the phrase when used in insurance policies, the courts in many cases have given to it great elasticity of meaning.

*See also Gray,* 240 F.2d at 466 (distinguishing *Diethelm & Co. v. The Flying Trader,* 141 F.Supp. 271 (S.D.N.Y.1956), *aff'd,* 244 F.2d 542 (2d Cir. 1957), on the ground that that case involved a bill of lading rather than marine insurance). *But see Hecht, Levis & Kahn, Inc. v. New Zealand Ins. Co.,* 121 F.2d 442, 442 (2d Cir.1941) ("At times it seems to have been thought that that phrase means something different in a bill of lading from what it does in a marine policy. But we need not say so; there would be 'no reason, and much inconvenience, in holding that the words have different meanings in the two kinds of commercial contract.' ") (citation omitted).

weather conditions. The peril of the sea clause covers

"occasional visitations of the violence of nature, like great storms, *even though these are no more than should be expected.*" Indeed, fortuitous actions of the sea much less violent than storms have been held to be within its intended coverage.

*The Continental Ins. Co. v. Hersent Offshore, Inc.*, 567 F.2d 533, 535 (2d Cir.1977) (citation omitted) (emphasis added). *See also Darien Bank,* 654 F.2d at 1020 (noting that "mere swells may or may not be enough based upon the circumstances of the case"); *Hersent Offshore,* 567 F.2d at 534–36 (finding "peril of the sea" from storm of "gale proportions" which, while "not a typical northeast storm" was "essentially a northeast storm as the phrase is customarily used"); *Allen N. Spooner & Son,* 314 F.2d at 756–57 (finding "peril of the sea" from swells caused by passing freighter which tilted the barge resulting in the collapse of a crane on the barge).[10]

█ The weather involved in this case constitutes a peril of the sea. If the defendants could establish that the weather encountered during the voyage was the proximate cause of the damage to the ALPHA STAR, I find that the weather was sufficiently fortuitous to constitute a peril of the sea. While the ordinary action of the waves does not constitute a sufficient fortuity to establish a peril of the sea, I hold that the weather encountered by the ALPHA STAR during her voyage is sufficient. The defendants need not show extraordinarily heavy weather in order to show a peril of the sea.

Further, I do not believe that the litmus test for peril of the sea is whether the weather was foreseeable. The weather in the North Atlantic and the Mediterranean in December is at times extreme. Therefore, under such a test, almost any weather could be considered foreseeable, thus virtually elimi-

nating heavy weather as a possible peril of the sea covered by hull insurance policies.

█ I also reject plaintiff's contention that if the wind is below a given value on the Beaufort Force scale, there is no "heavy weather" as a matter of law. Determining whether given weather is a peril of the sea is a fact-intensive inquiry which requires examination of the type of vessel, the location of the vessel, the expectability of the weather, as well as its severity. The weather experienced by the ALPHA STAR in both the Atlantic and Mediterranean was sufficiently severe and fortuitous to constitute a peril of the sea.

### 2. Proximate Cause

█ The insured also has the burden of proving that the loss was "'proximately caused' by the peril insured against and claimed under." *Linard,* 498 F.2d at 561. *See also* British Marine Insurance Act of 1906 § 55(1). Proximate cause is applied more strictly in maritime insurance cases than in negligence cases. *See Blaine Richards & Co., Inc. v. Marine Indemnity Ins. Co. of Am.,* 635 F.2d 1051, 1054 (2d Cir.1980). *See also Lanasa Fruit Steamship & Importing, Co. v. Universal Ins. Co.,* 302 U.S. 556, 562, 58 S.Ct. 371, 373–74, 82 L.Ed. 422 (1938). Courts are to look at the "predominant or determining" or the "real efficient" cause of the loss. *Blaine Richards & Co.,* 635 F.2d at 1054. Proximate cause is not determined by resort to "but for" causation. *Id.*

█ Where there is more than one potential cause, courts should not necessarily find that the "single cause nearest to the loss in time" is the proximate cause. *Id.* Indeed, the Supreme Court has noted that "proximate cause is the efficient cause and not a merely incidental cause which may be nearer in time to the result." *Lanasa Fruit,* 302

---

**10.** Gilmore and Black's treatise states that:

What is covered is not any loss that may happen *on* the sea, but fortuitous losses occurring through extraordinary action of the elements at sea.... Extraordinary action of the wind and waves is a sea peril.... Even a swell from a passing ship may be a "peril of the sea." On the other hand, ordinary wear and

tear are not included under the coverage of this or any other phrase in the clause, nor are losses which are anticipatable as regular incidents of sea carriage in general or of navigation in a particular part of the world.

Grant Gilmore & Charles L. Black, Jr., *The Law of Admiralty* § 2–9, at 72–73 (2d ed.1975).

U.S. at 562, 58 S.Ct. at 373–74. As one commentator has put it,

> [w]here two causes exist, the court should properly look for the cause which rendered the loss inevitable, distinguishing between the proximate cause and the remote cause.

2 Thomas J. Schoenbaum, *Admiralty & Maritime Law,* § 19–10, at 434 (2d ed. 1994). In *Muller v. Globe & Rutgers Fire Ins. Co.,* 246 F. 759, 762–63 (2d Cir.1917), the Second Circuit formulated the analysis as follows:

> That cause is proximate which sets the other causes in motion; only when causes are independent is the nearest in time looked to.... If there is an unbroken connection between act and injury, the act causes the injury; an intervening act is not the proximate cause of injury, unless it is efficient to break the causal connection.

In sum, "[d]etermination of proximate cause in these cases is thus a matter of applying common sense and reasonable judgment as to the source of the losses alleged." *Blaine Richards & Co.,* 635 F.2d at 1054–55. *See also, e.g., Lanasa Fruit,* 302 U.S. at 562–65, 58 S.Ct. at 373–75; *Northwest Transp. Co. v. Boston Marine Ins. Co.,* 41 F. 793, 800–03 (C.C.E.D.Mich.1890) (discussing extensively the doctrine of proximate cause in the context of marine insurance).

▌ Of course, the insurer may endeavor to prove that the loss was not due to a peril of the sea. As stated by Judge Rifkind in *Compania Transatlantica:*

> It does not follow that the insurer is liable for loss attributable to every incursion of sea water. *The underwriter may show that the loss was not caused by a peril of the sea but* by the intentional scuttling of the vessel, *by the inherent unfitness of the vessel,* by the exhaustion of the vessel's useful life through wear and tear, or by an explosion of the cargo.

*Compania Transatlantica,* 50 F.Supp. at 990 (citations omitted) (emphasis supplied).

The defendants argue that the "death blow" theory of proximate cause is appropriate under the facts of this case. In his treatise on marine insurance, Buglass states that,

> while the underwriter is not answerable for wear and tear and decay from ordinary causes, he is answerable for the risks insured against, though they may have been enhanced by the ordinary effects of the elements. This is sometimes called the "death blow" theory but is really a question of proximate cause; the question to be asked is "would this damage have occurred but for the operation of an insured peril?" Thus, if a vessel is classed with a reputable classification society and has been properly maintained in accordance with the requirements of that society and her plating fails in heavy weather, there is a prima facie claim under the policy even though her plating may have been subject to thinning or "aging" and even though it might have been necessary to effect the maintenance repairs very soon.

Leslie J. Buglass, *Marine Insurance and General Average in the United States* 97 (3d ed. 1991).

I need not decide, however, whether the "death blow" theory, which endorses a variant of "but for" causation, conforms to the rule of proximate cause I must apply. Nor need I decide whether HRS is a "reputable" classification society, since the death blow theory only allows the insured to meet its prima facie case, and only then if it can also show that the vessel was properly maintained in accordance with the requirements of its classification society. Here, HRS required notice if the integrity of the hull was breached as it was during the Atlantic crossing. The vessel owners were aware of the breach and their duty to notify HRS, and chose not to inform the society. For that reason alone, defendants cannot have recourse to the death blow theory as articulated by Buglass. Moreover, the vessel had not been properly maintained and was "out of class." In any event, when the evidence as a whole is considered, the defendants have failed to carry their burden of establishing proximate cause by a preponderance of the evidence.[11]

---

11. Defendants also cite an unpublished decision from the Court of Appeal of Singapore in support of the death blow theory. *Lombard Ins. Co. Ltd.* *v. Kin Yuen Co Pte Ltd.,* Civ. Appeal No. 70 of 1994 (Ct.App. Singapore Feb. 8, 1995). *Kin Yuen* involved the sinking of a vessel carrying a

I turn now to the individual items of damage defendant's claim were proximately caused by heavy weather in order to determine whether they meet the $7 million CTL requirement.

a. *Damage to Holds 2, 5, and 8: $1,565,-801*

Relying entirely on Van Grieken's report and testimony, defendants contend that heavy weather damaged some of the side shell plating and framing in the forepeak and all of the holds except hold No. 4. They estimate the cost of repairing this damage at $3,356,935. The repairs to holds 2, 5, and 8 alone amount to $1,565,801. In his analysis, Van Grieken has relied on his external examination of the hull and his observation that its concave condition was consistent with heavy weather.[12]

The report and Van Grieken's testimony fail to meet the defendants' burden. First, Van Grieken's survey was limited both in scope and in time. Second, and more importantly, the parameters of Van Grieken's survey were circumscribed by the assignment the owners gave him. He was not asked to and did not give an opinion on causation. Even assuming that Van Grieken intended to, and did, render an affirmative opinion on causation, however, his failure to examine carefully all of the evidence regarding the vessel's condition renders his opinion unpersuasive. He did not adequately address the effect of the corrosion and wastage of the steel on the damage he found.

The limitations in Van Grieken's evidence are best understood in the context of the defendants' theory of the case. The defendants do not contest that the corrosion and detached and buckled frames described here

existed. Instead, they ask this Court to find that such defects were simply the condition of the vessel and could not, as a matter of law, be the cause of the damages for which they seek recovery. Because of this approach, the defendants have utterly failed to carry their burden as to proximate cause.

Not only have defendants failed to prove that the damage was proximately caused by heavy weather, the plaintiffs have affirmatively proven that the damage at least as to holds 2, 5, and 8, and by inference to all of the side shell and frames, was instead caused by the wasted and corroded condition of the frames. It is undisputed that damage caused by corrosion or owner's negligence is not covered under the policy. In the words of a venerable opinion from a British court, the damage to the frames and side shell arose from a weakness within and was a consequence that must happen. *See Compania Transatlantica*, 50 F.Supp. at 991 (quoting *Ballantyne v. MacKinnon*, 1896, 2 Q.B. 455, 460). It is not, therefore, recoverable as caused by a peril of the sea.

In sum, I find that the proximate cause of the damage to the side shell and frames of the ALPHA STAR's holds 2, 5, and 8, was wastage and corrosion in the frames, rather than heavy weather. Examining all of the evidence with the common sense analysis I must apply, the predominant or real and efficient cause of the damage was the severely deteriorated and wasted condition of the web, which was due to long-term neglect and failure to maintain. The breaches in and concave shape of the hull were the result of the buckled and detached frames. Given the level of wastage in the structure of the vessel, which included corrosion far in excess of

shipment of asbestos. The vessel was acknowledged to have been in a weakened structural condition at the time it encountered heavy weather. The court held that heavy weather, rather than the alleged unseaworthiness, was the proximate cause of the ship's sinking.

This case is distinguishable on several grounds. First, the court held that the crack in the side shell plating was caused by heavy weather. There is no such persuasive evidence here. Second, the vessel at issue in *Kin Yuen* had sunk, and therefore the underwriters were unable to establish successfully—as have the plaintiffs

here—how weak and deteriorated her hull was. Third, to the extent that court adopts a "but for" test of proximate cause, its view of the law is inconsistent with the law I must apply.

12. Van Grieken's conclusion is inconsistent with the clear evidence that the "set in" condition of the starboard side of some of the holds was the result of damage from contact with an object such as a pier or tug, and not the result of wave action. Van Grieken made no distinction between the "set ins" on the port and starboard side of the ALPHA STAR.

the allowed 25%, this damage was inevitable from the mere fact of being at sea and under way. Thus, it is not surprising that the first breach in the integrity of the hull occurred on the port side of the vessel while it was in the Atlantic and the weather was striking its starboard side, and indeed, before it encountered any significant weather.[13] Accordingly, the defendants have failed to prove that the damage to the hull structure of at least cargo holds 2, 5, and 8 of the ALPHA STAR was caused by an insured peril.

### b. *Collapse of the No. 2 Hold Hatch Cover: $2,436,992*

Defendants claim that the damages associated with the collapse of the hatch cover of the No. 2 hold are the result of heavy weather experienced during the voyage and in January 1994 when the vessel was towed out to sea by the French Navy.[14] Altogether they estimate that the cost of these repairs is $2,436,992.[15]

The collapse of the No. 2 hold hatch cover and the consequent damage to surrounding areas was directly caused by the changes in pressure with the flow of water through the port side breaches in the hull of the No. 2 hold. These breaches were not the result of weather damage, but instead were directly caused by the buckling and detachment of corroded frames. As already noted, water had begun to leak into the No. 2 hold through cracks in the port side shell plating while the weather was still on the starboard side of the vessel. Once such a breach has begun, it will inevitably increase in size where the plating is unsupported by firm framing. Even then, the collapse of the No. 2 hatch cover and surrounding areas could have been avoided by opening hatches to

release the pressure from the suction effect of the seawater moving in and out of the hold,[16] as the attending surveyors advised the owners' representatives and crew to do. Thus, it was first the corrosion of the frames and then the owners' negligence, and not heavy weather, which was the proximate cause of this damage.

### c. *Cable Trays: $529,660*

I find that the cause of the damage to the electric cables, trays, and covers, was corrosion of the steel supports, and not heavy weather. The support structure was severely corroded and at some points completely wasted through.

### d. *Miscellaneous Testing Expenses: $398,000*

Defendants claim as part of their CTL calculation expenses related to testing the alignment of the vessel, including drydocking. While such testing may be a prudent exercise, there is no evidence in the record that the alignment of the hull was in fact altered or that the alteration was due to an insured peril such as heavy weather. The policy does not permit expenses incurred in testing to be included in the CTL computation when the testing reveals no damage was incurred. *A fortiori*, it does not permit recovery when the testing is not even done and the existence of the damage remains entirely speculative.

### e. *Sue and Labor Costs: $551,000*

■ Defendants argue that sue and labor costs may be considered in the calculation of constructive total loss. If an insured does show that a peril of the sea or other covered

13. I recognize that the leeward, as well as the windward, side of a vessel is under pressure when a vessel encounters heavy weather. Nonetheless, the unrefuted evidence is that the pressure is greater on the windward side of the vessel, and if damage is to be attributed to the weather it should reflect this fact.

14. Because of the result reached here it is unnecessary to reach the plaintiffs' claim that any damage occurring from heavy weather after December 31, 1993 was a separate occurrence under the policy and thus cannot be aggregated

with the earlier damages for purposes of determining whether there has been a CTL.

15. This figure includes items 1–4, 6, and 60% of item 5 of Van Grieken's list of damages. Van Grieken testified in his deposition that at least 60% of the deckplate renewals were due to the collapse of the No. 2 hatch cover.

16. A secondary cause for the damage to a portion of the deck may have been the significant corrosion in the starboard forward end of the deck surrounding the No. 2 hold.

event caused the damage, and that sue and labor costs were incurred to prevent a total loss or a CTL, the insured is entitled to add to the value for determination of constructive total loss, the sue and labor costs incurred after notice of abandonment.[17]

■ I find that the sue and labor costs cannot be included in the calculation of CTL. First, the FISH expenses of $210,000 were incurred prior to notice of abandonment, and therefore may not be aggregated in the CTL calculation. Second, the Smit Tak expenses of $341,000 were not incurred to save the vessel from an insured peril, and therefore cannot be included in determining CTL. Smit Tak was called in after the French Navy took the ALPHA STAR out to sea to prevent her from sinking near the port. This action was taken because of the breaches in the hull, which were caused by corrosion, not by heavy weather. Accordingly, the need for Smit Tak's services was not proximately caused by an insured peril.

### f. Summary

Under the hull policy at issue in this case, the insured must prove that the damage to the ALPHA STAR caused by an insured peril rendered the vessel a constructive total loss. In order to do this, the insured must

17. Plaintiffs argue that sue and labor costs incurred prior to notice of abandonment cannot be used in the calculation of CTL. Defendants argue that they have the option of including the pre-notice sue and labor costs in the CTL calculation, or claiming them separately under the sue and labor clause. After the decision in *Northern Barge Line Co. v. Royal Ins. Co., Ltd.*, 1974 A.M.C. 136 (N.D.Iowa 1973) (holding that even sue and labor costs incurred prior to notice of abandonment could be added in calculating CTL), *aff'd*, 492 F.2d 1248 (8th Cir.1974), the standard hull policy's CTL clause was amended to state that " 'expenses incurred prior to tender of abandonment shall not be considered if such are to be claimed separately under the Sue and Labor clause.' " Buglass, *supra*, at 114. Accordingly, while it is clear that post-notice sue and labor costs may be included in the CTL calculation, pre-notice costs may only be included if they are not claimed separately under the sue and labor clause. Only the sue and labor costs paid to Smit Tak, which are stipulated to be $341,000, were incurred after the January 5, 1994 notice of abandonment.

18. Defendants argue that plaintiffs have waived their right to object to the sufficiency of the

show that the damages to the ALPHA STAR exceed the agreed value of $7,000,000.[18] The total amount excludable from defendants' $8,595,958 total estimate [19] under the above analysis is at least $4,930,453. Defendants have failed to prove that $7 million in damages were caused by heavy weather.[20]

In sum, I find that defendants have met their burden that the ALPHA STAR encountered heavy weather, an insured peril of the sea, on her voyage from Port Cartier to Fos. I also find, however, that defendants have failed to carry their burden of showing that the damage they have identified to the ALPHA STAR was proximately caused by the heavy weather.

### B. Unseaworthiness

■ Had the defendants succeeded on their claim, the plaintiffs would not have escaped liability by resort to their affirmative defenses that they are relieved from liability under the policy because the ALPHA STAR was unseaworthy. "Seaworthiness is the ability of a vessel adequately to perform the particular services required of her on the voyage she undertakes." *McAllister Lighterage Line, Inc. v. Insurance Co. of N. Am.*, 244 F.2d 867, 870 (2d Cir.), *cert. denied*, 355 U.S. 871, 78 S.Ct. 123, 2 L.Ed.2d 76 (1957).

proofs of loss because Burbridge waited too long to respond specifically to Van Grieken's report. I find, however, that plaintiffs promptly rejected defendants' claim and gave defendants sufficiently prompt notice of why.

19. The defendants' $8,595,958 estimate does not include sue and labor costs. Accordingly, the sue and labor expenses are not subtracted from that figure as part of this analysis.

20. I calculate the CTL amount as follows: Van Grieken's total damage estimate was $8,595,958. Subtract from that the total which I found to be clearly not caused by an insured peril (heavy weather), $4,930,453, for a total of $3,665,505—far short of the required $7 million. I note that this holding is not an acknowledgement that the other alleged damage was caused by heavy weather—indeed, I have grave doubts that defendants have shown that any significant amount of the damage was caused by heavy weather. Rather, I find that I need go no further than examining the above items in order to conclude definitively that defendants have failed to prove a CTL.

Plaintiffs argue that defendants breached two warranties of seaworthiness which they contend are implied into time hull insurance policies. The two warranties are: (1) an absolute implied warranty of seaworthiness which operates at the inception of the policy; and (2) a negative implied warranty of seaworthiness which "applies only after the policy attaches." *Employers Ins. of Wausau v. Occidental Petroleum Corp.*, 978 F.2d 1422, 1431 (5th Cir.1992), *cert. denied*, 510 U.S. 813, 114 S.Ct. 61, 126 L.Ed.2d 30 (1993).

■ Both English and American law recognize a warranty similar to what the American cases call the negative implied warranty of seaworthiness in time policies. The existence of an absolute implied warranty of seaworthiness for time hull policies, however, is not without dispute. In England there is the equivalent of an absolute implied warranty of seaworthiness for *voyage* insurance policies, which "insure against losses caused during a single voyage." *Employers Ins. of Wausau*, 978 F.2d at 1432 & n. 10. But English law does not recognize an absolute implied warranty of seaworthiness for *time* insurance policies, which insure the hull of the vessel for a set period of time.[21] Today, virtually all policies issued in both the American and British markets are time policies.

Moreover, the "American rule"—that is, the rule that the absolute implied warranty of seaworthiness exists—is not universally accepted by all American authorities. In fact, the Second Circuit case law is mixed on this question. For example, the Second Circuit in *McAllister Lighterage Line*, 244 F.2d at 871, stated that "[i]t is clear that implied in every policy of full insurance is a covenant of seaworthiness." It also stated that "[w]ith a term policy of insurance the warranty of seaworthiness arises at the time when the

insurance becomes effective." *Id.* at 870. Similarly, in *Henjes v. Aetna Ins. Co.*, 132 F.2d 715, 719 (2d Cir.), *cert. denied*, 319 U.S. 760, 63 S.Ct. 1316, 87 L.Ed. 1711 (1943), the Court, citing *Union Ins. Co. v. Smith*, 124 U.S. 405, 427, 8 S.Ct. 534, 546, 31 L.Ed. 497 (1888), noted that "[t]here is in the United States an implied warranty by the insured in a time marine policy that the ship is seaworthy at the time the policy period begins." *See also Neubros Corp. v. Northwestern Nat'l Ins. Co.*, 359 F.Supp. 310, 315–16 (E.D.N.Y.1972).

But earlier in the same year as *McAllister Lighterage Line* was decided, the Second Circuit rejected the existence of such a warranty, stating that "[a]ppellees correctly disclaimed defense of an implied warranty of seaworthiness, since these are time policies." *Gray*, 240 F.2d at 466. The *Gray* Court noted that the earlier cases such as *Henjes*, which had stated that there was an implied warranty of seaworthiness in time policies, had only done so in *dicta*. *Id.* at 466 n. 10. *See also Gregoire v. Underwriters at Lloyds*, 559 F.Supp. 596, 599 (D.Alaska 1982) (not reaching the issue, but noting that the absolute implied warranty is "the aspect of the implied warranty that has been most heavily criticized.").

The Fifth Circuit has clearly recognized the existence of the absolute implied warranty. In *Employers Ins. of Wausau*, that Court recently reaffirmed its holding in *Saskatchewan Gov't Ins. Office v. Spot Pack, Inc.*, 242 F.2d 385 (5th Cir.1957), that the American rule is that there are two implied warranties of seaworthiness, one that is absolute, and one that is a "negative" warranty. *Employers Ins. of Wausau*, 978 F.2d at 1434. *See also 5801 Assoc., Ltd. v. Continental Ins. Co.*, 983 F.2d 662, 664 (5th Cir.1993); *Insur-*

---

**21.** Under English law time policies such as that at issue in this case have no absolute implied warranty of seaworthiness when the policy takes effect. *See* Derek P. Langhauser, Note, *Implied Warranties of Seaworthiness: Applying the Knowing Neglect Standard in Time Hull Insurance Policies*, 39 Me.L.Rev. 443, 449–51 (1987). The Marine Insurance Act of 1906 states that:

> In a time policy there is no implied warranty that the ship shall be seaworthy at any stage of the adventure, but where, with the privity of the assured, the ship is sent to sea in an

unseaworthy state, the insurer is not liable for any loss attributable to unseaworthiness.

Marine Insurance Act of 1906, § 39(5). Thus, under the English rule, "an insurer may be able to disclaim liability for a particular loss if it can demonstrate that (1) the vessel was unseaworthy, (2) the insured was privy to vessel's condition when it was sent to sea, and (3) the unseaworthy condition proximately caused the particular loss." *Employers Ins. of Wausau*, 978 F.2d at 1433.

ance Co. of North Am. v. Board of Comm'rs of Port of New Orleans, 733 F.2d 1161, 1165 (5th Cir.1984); Tropical Marine Prods., Inc. v. Birmingham Fire Ins. Co. of Pa., 247 F.2d 116, 119 (5th Cir.), cert. denied, 355 U.S. 903, 78 S.Ct. 331, 2 L.Ed.2d 260 (1957); Texaco, Inc. v. Universal Marine, Inc., 400 F.Supp. 311, 322–23 (E.D.La.1975); Lemar Towing Co., Inc. v. Fireman's Fund Ins. Co., 352 F.Supp. 652, 660–61 (E.D.La.1972), aff'd, 471 F.2d 609 (5th Cir.), cert. denied, 414 U.S. 976, 94 S.Ct. 292, 38 L.Ed.2d 219 (1973).[22] Other Circuits have followed the lead of the Fifth Circuit. See, e.g., L & L Marine Service, Inc. v. Insurance Co. of N. Am., 796 F.2d 1032, 1034–36 (8th Cir.1986), cert. denied, 479 U.S. 1065, 107 S.Ct. 952, 93 L.Ed.2d 1000 (1987); Kilpatrick Marine Piling v. Fireman's Fund Ins. Co., 795 F.2d 940, 945 (11th Cir.1986). In Employers Ins. of Wausau, the Fifth Circuit recognized that there is some controversy over this issue, but nevertheless decided to continue recognizing these warranties. The Court stated that

> Although we described the American rule in Spot Pack as being settled, we recognized that "[h]ow this came to be the rule of general acceptance for all Time policies is obscure." Commentators were also perplexed by the source of the so-called American rule regarding time policies, and

**22.** Two additional Fifth Circuit cases, D.J. McDuffie, Inc. v. Old Reliable Fire Ins. Co., 608 F.2d 145 (5th Cir.1979), cert. denied, 449 U.S. 830, 101 S.Ct. 97, 66 L.Ed.2d 35 (1980), and Gulfstream Cargo, Ltd. v. Reliance Ins. Co., 409 F.2d 974 (5th Cir.1969), are often cited in support of the existence of an absolute implied warranty of seaworthiness. They, however, turn on the fact that the insured had knowledge of the unseaworthy condition at the time the insurance attached, and that by failing to notify the insurance company, they were, in effect, violating their duty to inform fully the insurer of any facts material to the coverage.

**23.** Commentators have also split on the status of the "American" rule. See, e.g., Gilmore & Black, supra, § 2–6, at 65 ("No case has been found squarely basing decision of the so-called 'American Rule,' and the guess is ventured that the Supreme Court, if the issue is even tendered to it, will not uphold this warranty."); Buglass, supra, at 43–44 (referring to absolute warranty as "rather harsh and impractical"). But see Schoenbaum, supra, § 19–8, at 426 ("American maritime

our decision in Spot Pack was criticized as resting on "quite slender" authority.

\* \* \* \* \* \*

> We are aware of the criticism that has been levelled against our Spot Pack decision; however, we decline to revise our interpretation of history.

Id. (citations omitted).[23]

While the authorities are mixed, I hold that under federal admiralty law,[24] there are two separate warranties of seaworthiness implied in time hull insurance contracts—the absolute implied warranty of seaworthiness and the negative implied warranty. The more modern cases seem to agree that these implied warranties exist, and I believe that if the Second Circuit were faced with the issue today, it would hold that both warranties are applicable to time hull insurance contracts. From a policy perspective this rule is justified by the fact that at the time the policy attaches, the insured is in the best position to know the state of the vessel and how the vessel will be used during the period of the insurance. Implying such a warranty also is appropriate because the insured is in the best position to ensure that the vessel is seaworthy—that is, able adequately to perform the particular services required of her—before the vessel undertakes a voyage. See id. at 1436. The burden is on the insurer to prove unseaworthiness. See id. at 1436 n. 14; Darien Bank, 654 F.2d at 1021.[25]

law implies in every time hull insurance policy a warranty of seaworthiness.").

**24.** The Supreme Court has held that under certain circumstances, state law is applicable to marine insurance contracts. Wilburn Boat Co. v. Fireman's Fund Ins. Co., 348 U.S. 310, 75 S.Ct. 368, 99 L.Ed. 337 (1955). To determine whether to apply state law or federal admiralty law, Wilburn Boat requires a court to look at whether "there is a judicially established federal admiralty rule governing" the issue. Id. at 314, 75 S.Ct. at 370–71. In Thanh Long Partnership v. Highlands Ins. Co., 32 F.3d 189, 193–94 (5th Cir. 1994), the Fifth Circuit noted that "[e]ntrenched federal precedent exists on the implied warranty of seaworthiness and ... makes Wilburn Boat inapplicable to the seaworthiness issue," and held that "federal admiralty law displaces state law as to the implied warranty of seaworthiness in maritime insurance contracts."

**25.** As was explained without contradiction at trial, the British insurance market compensates for the absence of the absolute implied warranty by

### 1. *Implied Absolute Warranty of Seaworthiness*

The absolute implied warranty of seaworthiness applies to the moment the time hull policy comes into effect. To succeed in asserting this warranty,

> The insurer need not demonstrate that the insured had knowledge of the unseaworthy condition nor that the insured was somehow at fault in not discovering the unseaworthy condition. It is enough to discharge the insurer ... if the vessel is in fact not seaworthy at the inception of the policy.

*Employers Ins. of Wausau,* 978 F.2d at 1436 (quotation marks and citations omitted).

Defendants contend that even if the absolute implied warranty of seaworthiness applies to this case, it is modified by the so-called Inchmaree clause[26] of the time hull insurance contract. The Inchmaree clause protects the insured against, among other things, latent defects and the negligence of the crew. Buglass, *supra,* at 143. *See also Allen N. Spooner & Son,* 314 F.2d at 757 (negligence); *Tropical Marine Prods.,* 247 F.2d at 120 (latent defect); *Sipowicz,* 370 F.Supp. at 448–49 (latent defect). The Inchmaree clause was designed to broaden the liability of the insurer. *Linard,* 498 F.2d at 563.

Defendants expressly do not argue that the crew was negligent; rather, they argue that the thinning of the steel on the ALPHA STAR, though "not a true latent defect," should still be covered by the "spirit"

of the Inchmaree clause. "A latent defect is a defect which a reasonably careful inspection would not reveal. It is not a gradual deterioration but rather a defect in the metal itself." *Sipowicz,* 370 F.Supp. at 449.[27] Thus, the clearly deteriorated condition of the steel of the ALPHA STAR makes it impossible to conclude that the vessel was damaged because of a latent defect. If the owners had chosen to inspect the frames of the holds, they would have learned immediately that they were substandard and presented a significant risk to the structural integrity of the vessel. Accordingly, the Inchmaree clause does not rid defendants of plaintiffs' unseaworthiness argument.

Defendants also argue that this absolute warranty only attaches if the insured vessel is in port with repair facilities at the moment the policy comes into effect. In *Henjes,* 132 F.2d at 719, the Second Circuit stated in dicta that

> [t]here is in the United States an implied warranty by the insured in a time marine policy that the ship is seaworthy at the time the policy period begins. *But that is true only when the vessel is in port at the time.*

(Emphasis added). *See also New York & P.R.S.S. Co. v. Aetna Ins. Co.,* 204 F. 255, 258 (2d Cir.1913) (dicta); *Berwind v. Greenwich Ins. Co.,* 114 N.Y. 231, 234, 21 N.E. 151 (1889) ("In every case of marine insurance by a general policy covering all perils of the sea, *where the vessel insured is in port,* there is an implied warranty that the vessel is sea-

---

requiring the insured to pay for a survey conducted by S.A. prior to the issuance of coverage. No such practice exists in the American market. Otherwise, the American and British insurance markets have functionally competitive rates.

**26.** The Inchmaree clause was added to the standard form insurance contract "to overcome the effects of a decision of the House of Lords which was adverse to the assured." *Allen N. Spooner & Son, Inc.,* 314 F.2d at 757. *See also Linard,* 498 F.2d at 562–63. The term "Inchmaree" comes from the name of the ship involved in the House of Lords case. *Tropical Marine Prods.,* 247 F.2d at 119.

**27.** In *Tropical Marine Prods.,* the Fifth Circuit defined latent defect for purposes of interpreting the Inchmaree clause:

> A latent defect is one that could not be discovered by any known and customary test, and ... is a hidden defect and generally involves the material out of which the thing is constructed as distinguished from the results of wear and tear. It is a hidden defect ... not manifest, but hidden or concealed, and not visible or apparent; a defect hidden from knowledge as well as sight; ... a defect which reasonably careful inspection will not reveal; one which could not have been discovered by inspection ... by any known and customary test.

247 F.2d at 121 n. 11 (citations and quotation marks omitted).

worthy at the inception of the risk.") (emphasis added); *S.S. Natalie,* 1959 A.M.C. 2379, 2389–94 (1959) (Russell T. Mount, arb.) (arbitration) (reviewing the cases on this issue).

Plaintiffs argue that the absolute implied warranty does not require that the vessel be in port at the moment the policy attaches, and that such a rule would be inappropriate under the modern practice of insuring fleets of large, ocean-going bulk carriers. Plaintiffs fail, however, to cite a single case which holds that the warranty exists even if the policy attaches while the vessel is at sea. Moreover, this Court has been unable to find a case which turns on the issue.[28] *Employers Ins. of Wausau,* the case on which plaintiffs rely to support their position that the absolute warranty exists, declined to reach the issue of whether the absolute warranty is applicable when the policy attaches while the vessel is out to sea. The Fifth Circuit noted that

> The sound reasons supporting an absolute, implied warranty of seaworthiness at the inception of a voyage policy also support such a warranty in the context of a time policy—*at least where the ship is in a port of repair at the time the policy attaches....* Where, as in this case, a time policy attaches *while the vessel is in a port of repair,* we can discern no reason for relaxing the strict standard embodied in the absolute warranty of seaworthiness implied in a voyage policy.

*Employers Ins. of Wausau,* 978 F.2d at 1436 (emphasis added).

 I find that the policy underlying this absolute warranty—that the owner is in the best position to ensure the seaworthiness of the vessel at the moment the policy attaches,

and is therefore under an absolute duty to do so—supports the proposition that the warranty arises only if the vessel is in port at the time the insurance attaches.[29] Only under these circumstances would the owner be able to make repairs. Moreover, as the plaintiffs note, it is unusual and unwise to undertake significant structural repairs during the course of a voyage. Therefore, any other rule would require the owner to provide an absolute warranty when the owner would be powerless to ensure that the vessel meets this test.

I am aware that this ruling substantially vitiates any absolute implied warranty of seaworthiness since vessels will be in port when a time policy attaches only coincidentally and rarely. The limited availability of this warranty, however, is appropriate given (1) its rather questionable ancestry; (2) the significant burden such a warranty places on an owner, who is held essentially to a strict liability standard; (3) the fact that the rates in effect in the American and British insurance markets apparently assume that no such warranty exists; and (4) the importance of English law in interpreting and applying marine insurance contracts. *See, e.g., Standard Oil Co. of New Jersey v. United States,* 340 U.S. 54, 59, 71 S.Ct. 135, 138, 95 L.Ed. 68 (1950); *Queen Ins. Co. of Am. v. Globe & Rutgers Fire Ins. Co.,* 263 U.S. 487, 493, 44 S.Ct. 175, 176–77, 68 L.Ed. 402 (1924).

Under the circumstances of this case, then, there was no absolute implied warranty of seaworthiness in this policy because at the time the insurance attached, November 20, 1993, the ALPHA STAR was not in a port of repair.

---

28. In *D.J. McDuffie,* 608 F.2d at 145, it appears that the insured barge was *not* at port when the policy attached, and the court nevertheless upheld the district court's finding that the owner breached the absolute implied warranty. In that case, however, there was clear evidence that the owner knew that the vessel was unseaworthy. Thus, this case is more like one involving failure to disclose a material fact to the insurer. The same analysis serves to distinguish *Gulfstream Cargo,* 409 F.2d at 974. The fact that these cases turned on the issue of knowledge on the part of the owner was recognized by the Fifth Circuit in *Employers Ins. of Wausau,* 978 F.2d at 1435–36.

29. At trial, plaintiffs discussed the requirement that the vessel be in port when the policy attaches in terms of a "waiver" of the implied warranty. As the plaintiffs phrase it, they did not "waive" the warranty by not requiring the vessel to be in port when the policy attached. None of the cases discuss this issue in terms of waiver. Rather, the issue is more properly conceptualized as a refusal to impose the duty of warranting absolute seaworthiness on an owner *unless* the vessel is in port. The insurer's knowing relinquishment of an otherwise valid right is not at issue.

### 2. *Negative Implied Warranty of Seaworthiness*

 The second implied warranty of seaworthiness is the so-called negative implied warranty. Under this warranty, "the insured promises not to knowingly send a vessel to sea in an unseaworthy condition." *Employers Ins. of Wausau*, 978 F.2d at 1432. To find a breach of the negative implied warranty, the Court must find that the insured—the owner of the vessel—had knowledge of the unseaworthy condition of the vessel. *Id.* The Fifth Circuit has discussed this negative warranty in the following terms:

> It is not that the vessel shall continue absolutely to be kept in a seaworthy condition, or even that she be so at the inception of each voyage, or before departure from each port during the policy term. It is, rather, stated in the negative that the Owner, from bad faith or neglect, will not knowingly permit the vessel to break ground in an unseaworthy condition. And, unlike a breach of a warranty of continuing seaworthiness, express or implied, which voids the policy altogether, the consequence of a violation of this "negative" burden is merely a denial of liability for loss or damage caused proximately by such unseaworthiness.

*Spot Pack*, 242 F.2d at 388.[30] *See also Board of Comm'rs of Port of New Orleans*, 733 F.2d at 1165.

Defendants argue that plaintiffs have waived this claim by failing to articulate it adequately in the Amended Complaint. I find, however, that the Amended Complaint provides defendants with sufficient notice of plaintiffs' contentions with respect to the claims of unseaworthiness. The first cause of action—which claims that the loss was due to the deteriorated condition of the vessel—states that "the defendant Lone Eagle and Olympic Shipping knew or should have known of the vessel's deteriorated and unseaworthy condition." This is a sufficient statement of a claim of breach of the negative implied covenant of unseaworthiness to put the defendants on notice of plaintiffs' allegation.

 I find, however, that the plaintiffs have failed to meet their burden of showing that the defendants breached the negative implied warranty of seaworthiness. In order to succeed in such a claim, plaintiffs must show (1) that the vessel was unseaworthy; (2) when it "broke ground"—or went to sea; and (3) that the owner had knowledge that the vessel was unseaworthy and yet allowed it to sail anyway.

At the outset, I note that there can be no question that for some substantial period of time before this voyage and during the entire time of the voyage, the ALPHA STAR was unseaworthy due to the existence of severe corrosion that took the vessel "out of class" and caused the buckling and detachment of the web. This condition was significant enough to render the ALPHA STAR incapable of safely performing the winter Atlantic crossing, during which it was likely to encounter harsh weather.

 Plaintiffs argue that the owners breached the negative implied warranty by allowing the ALPHA STAR to sail from Port Cartier. Plaintiffs suggest that (1) because the owners knew of the recent significant losses of bulk carriers, particularly older vessels; (2) because they changed classification societies from DNV, an IACS member, to HRS, a less prestigious society, knowing that HRS did not engage in rigorous surveying of vessels classed with it; and (3) because of the openly evident corroded condition of the vessel, the owners were sufficiently put on notice that the ALPHA STAR was unseaworthy prior to her leaving Port Cartier. The most these facts show, however, is that the owners of the ALPHA STAR were negligent in maintaining the vessel. This is insufficient to show a breach of the negative implied warranty of seaworthiness, which requires knowledge. *Cf. Gregoire*, 559 F.Supp. at 600–01 (rejecting negligence standard for negative implied warranty).

---

**30.** The negative implied warranty is similar to the English rule for time policies as stated in Section 39(5) of the Marine Insurance Act of 1906. *Employers Ins. of Wausau*, 978 F.2d at 1434.

As of December 20, however, the owners learned of the breach in the integrity of the hull and the buckled and detached frames in the cargo holds. At that point they had actual knowledge that the vessel was unseaworthy. The issue thus becomes whether the owners allowed the vessel to break ground in an unseaworthy condition after December 20, 1993.

Plaintiffs argue that the owners had an obligation to make repairs to the vessel at Gibraltar, or at least to arrange for a competent survey to be done to determine whether the vessel could safely continue to Fos and complete her voyage. Defendants argue, however, that the ALPHA STAR did not "break ground" from Gibraltar because the vessel did not actually enter the port, and that therefore the warranty does not apply.

I find that the ALPHA STAR did not break ground when it left Gibraltar. The policy underlying the rule is that an owner should not be able to allow a vessel which the owner knows is unseaworthy, to leave the safety of a port for the open sea. This is because the owner can undertake repairs at the port, and ensure the safety of the vessel and her crew. But where, as here, the vessel is not in port, but merely in the roads, the owner is not in a position to repair the vessel thereby ensuring that it leaves port—or breaks ground—in a seaworthy condition. I note that this holding is based in part on the notion that the Master of a vessel is under no obligation to the insurance company to seek a port of refuge when damages to the ship develop. Once the vessel has entered a port of refuge, however, the owner may not knowingly allow the vessel to leave in an unseaworthy condition. Accordingly, I hold that the defendants did not breach the negative implied warranty of seaworthiness when the ALPHA STAR left the roads near the port of Gibraltar.

### C. Sue and Labor Costs and Unjust Enrichment

Defendants argue that, pursuant to the Sue and Labor clause of the hull insurance contract, they are entitled to reimbursement for salvage expenditures intended to reduce the extent of the potential loss. This in-

cludes the payments to FISH and Smit Tak, which are stipulated to be $210,000 and $341,000, respectively. Plaintiffs counter by claiming that the money they paid to Smit Tak as guarantor for Smit Tak's salvage services should be returned under a theory of unjust enrichment because owners were not entitled to sue and labor expenses.

### 1. Defendants' Right to Sue and Labor Costs

An insured is not entitled to sue and labor costs if it fails to show that the costs were incurred in an effort to avoid the total loss or CTL of the vessel due to an insured peril. In *Reliance Ins. Co. v. The Escapade,* 280 F.2d 482 (5th Cir.1960), the Court noted that

> The obligation [to reimburse sue and labor costs] comes into being only when the action taken is to minimize or prevent a loss for which the underwriter would be liable. If the underwriter would not be liable at all ... there would be no contractual obligation to repay sue and labor. The sue and labor "coverage" is therefore tied irrevocably to the insured perils coverage.

*Id.* at 489. *See also* Buglass, *supra,* at 355; Marine Insurance Act of 1906, § 78(3). Defendants do not dispute this.

Given my finding above that the damage to the ALPHA STAR was largely the result of the corrosion and wastage of the vessel's structure, it follows that the sue and labor costs were incurred not to save the vessel from an insured peril—such as heavy weather. Simply put, the owners would not have had to hire Smit Tak or FISH had there not been two holes in the side of the No. 2 hold—holes created by the wastage and corrosion of the frames. Accordingly, defendants are not entitled to any sue and labor costs.

### 2. Unjust Enrichment

Plaintiffs claim that the defendants were unjustly enriched when the plaintiffs paid a portion of the cost of the salvage operation. Plaintiffs argue that because the ALPHA STAR was not damaged as a result of an insured peril, they were not obligated

to make this payment, and therefore the vessel owners should reimburse them. In order to succeed in a claim for unjust enrichment under New York law, plaintiff must show

> not only that there was enrichment, but that the enrichment was at the plaintiff's expense, and that the circumstances dictate that, in equity and good conscience, the defendant should be required to turn over its money to the plaintiff.

*Universal City Studios, Inc. v. Nintendo Co., Ltd.,* 797 F.2d 70, 79 (2d Cir.), *cert. denied,* 479 U.S. 987, 107 S.Ct. 578, 93 L.Ed.2d 581 (1986). *See also Rule v. Brine, Inc.,* 85 F.3d 1002, 1011 (2d Cir.1996).

 The defendants are not entitled under the policy to reimbursement for sue and labor costs, and therefore were not entitled to the payment made by plaintiffs to Smit Tak. Defendants reaped the reward for the payment, since the vessel was saved from actual total loss, and Smit Tak's efforts permitted them to sell it for scrap and recoup at least some of their investment. Accordingly, I find that in equity and good conscience, the defendants should be required to pay plaintiffs $159,000, the amount paid by plaintiffs to Smit Tak under the guarantee agreement.[31]

### III. *Conclusion*

For the reasons stated above, plaintiffs are not liable to defendants under the time hull insurance policy issued for the ALPHA STAR. In addition, defendants are liable to plaintiffs for $159,000, the amount paid to satisfy the guarantee to Smit Tak.

SO ORDERED:

---

**31.** The Royal Bank argues that it cannot be liable for unjust enrichment since it did not sign the guarantee. It did, however, receive a benefit from plaintiffs' guaranty since it was the mortgagee of the vessel and it received the value of the recovered vessel.