Atl. Specialty Ins. Co. v. Coastal Envtl. Grp., Inc.

# In the
# United States Court of Appeals
## For the Second Circuit

August Term, 2019

No. 18-3236-cv

ATLANTIC SPECIALTY INSURANCE COMPANY,
*Plaintiff-Counter-Defendant-Appellant,*

*v.*

COASTAL ENVIRONMENTAL GROUP INC.,
*Defendant-Cross-Defendant-Counter-Claimant-Cross-Claimant-Appellee,*

STERLING EQUIPMENT, INC.,
*Defendant-Third-Party-Plaintiff-Cross-Claimant-Counter-Claimant-*
*Cross-Defendant-Appellee,*

GLOBAL INDEMNITY INSURANCE AGENCY, INC.,
*Third-Party-Defendant-Third-Party-Plaintiff-Cross-Defendant-Counter-*
*Defendant-Appellee,*

ALL RISKS, LTD.,
*Third-Party-Defendant-Cross-Claimant-Counter-Claimant-Appellee.*

Appeal from the United States District Court
for the Eastern District of New York.
No. 14-cv-7403 — Joan M. Azrack, *Judge*.

ARGUED: OCTOBER 23, 2019
DECIDED: DECEMBER 13, 2019

Before:  KATZMANN, *Chief Judge*, CHIN and DRONEY, *Circuit Judges*.

After the loss off Coney Island of the barge the "MIKE B," Plaintiff-Appellant Atlantic Specialty Insurance Co. ("Atlantic") sought a declaratory judgment that the insurance policy it had issued to Defendant-Appellee Coastal Environmental Group, Inc. ("Coastal") was void *ab initio* or, in the alternative, that there was no coverage for the loss of the barge or damage to an adjacent pier.  Judge Wexler of the U.S. District Court for the Eastern District of New York conducted a bench trial but passed away prior to issuing his findings of fact and conclusions of law.  The case was transferred to Judge Azrack, who, after no party requested the recall of any witness under Federal Rule of Civil Procedure 63, issued findings of fact and conclusions of law in her role as successor judge and entered judgment finding Atlantic liable to Coastal under the terms of the policy.  On appeal, Atlantic argues that Judge Azrack made legal, factual, and evidentiary errors and that Judge Azrack erred by not recalling certain witnesses.  Atlantic also argues that, due to Judge Azrack's role as a successor judge making findings of fact based only on the trial record, these factual findings are subject to *de novo* review.  We conclude that, under Federal Rule of Civil Procedure 52(a)(6), factual findings of successor judges who have certified their familiarity with the record are subject to the "clearly erroneous"

2

standard of review, and, under Federal Rule of Civil Procedure 63, a successor judge is under no independent obligation to recall witnesses unless requested by one of the parties. In addition, we find no reversible error in Judge Azrack's findings of fact and conclusions of law, and therefore the judgment below is **AFFIRMED.**

------

JAMES W. CARBIN (Patrick R. McElduff, ICC Industries Inc., New York, NY, *on the brief*), Duane Morris LLP, Newark, NJ, *for Plaintiff-Counter-Defendant-Appellant* Atlantic Specialty Insurance Company

ERIC J. MATHESON (Don P. Murnane, Jr., Michael E. Unger, *on the brief*), Freehill Hogan & Mahar LLP, New York, NY, *for Defendant-Cross-Defendant-Counter-Claimant-Cross-Claimant-Appellee* Coastal Environmental Group Inc.

Gregory G. Barnett, Casey & Barnett, LLC, New York, NY, *for Defendant-Third-Party-Plaintiff-Cross-Claimant-Counter-Claimant-Cross-Defendant-Appellee* Sterling Equipment, Inc.

Patrick M. Kennell, Kaufman Dolowich Voluck, LLP, New York, NY, *for Third-Party-Defendant-Third-Party-Plaintiff-Cross-Defendant-Counter-Defendant-Appellee* Global Indemnity Insurance Agency, Inc.

Peter T. Shapiro, Lewis Brisbois Bisgaard & Smith LLP, New York, NY, *for Third-Party-*

*Defendant-Cross-Claimant-Counter-Claimant-Appellee* All Risks, Ltd.

DRONEY, *Circuit Judge*:

Plaintiff-Appellant Atlantic Specialty Insurance Company ("Atlantic") appeals from a final judgment of the United States District Court for the Eastern District of New York (Azrack, *J.*). Atlantic brought that action after the April 2013 loss of the "MIKE B," a spud barge deployed to support a crane to repair Coney Island's Steeplechase Pier, which had been damaged by Hurricane Sandy in 2012. Atlantic had issued a maritime hull insurance policy to Defendant-Appellee Coastal Environmental Group Inc. ("Coastal") for coverage of the MIKE B, as well as related protection and indemnity insurance. Atlantic sought a declaratory judgment that the policy was void *ab initio* or, in the alternative, that the loss of the MIKE B and damage to the pier caused by the sinking vessel were not covered under the terms of the policy. Coastal counterclaimed for the amount it alleged it was owed under the policy.

Judge Leonard D. Wexler of the United States District Court for the Eastern District of New York presided over the action and conducted a bench trial in October and November of 2017. However, Judge Wexler passed away in March 2018 prior to issuing findings of fact and conclusions of law. The case was transferred to Judge Joan M. Azrack, who, after no party requested the recall of any witness under Federal Rule of Civil Procedure 63, certified her familiarity with the record and issued her findings of fact and conclusions of law in September 2018. *See Atl. Specialty Ins. Co. v. Coastal Envtl. Grp.*, 368 F. Supp. 3d 429 (E.D.N.Y. 2018). Judge Azrack found that the policy was not void and covered the losses, and entered judgment for Coastal.

On appeal, Atlantic asks us to vacate the district court's findings of fact and conclusions of law and enter a declaratory judgment in favor of Atlantic or, in the alternative, remand for a new trial. Atlantic argues, among other things, that this Court should review Judge Azrack's findings

of fact *de novo* due to her role as a successor judge, and that Judge Azrack erred by not recalling witnesses during her consideration of the record.

We hold that findings of fact made by a successor judge in the circumstances here are subject to the "clearly erroneous" standard of review contained in Federal Rule of Civil Procedure 52(a)(6), even where the successor judge rules based on a documentary record, and under that standard we find no basis to vacate the district court's judgment. We also conclude that Judge Azrack was not required to recall any witnesses because no party requested such a recall. Accordingly, we affirm the judgment of the district court.

**I.  BACKGROUND**

**A.  Factual Background[1]**

Coney Island's Steeplechase Pier is situated on the southern side of the island, extending into Lower New York Bay toward the Rockaways and the Atlantic Ocean. In 2012, the pier was substantially damaged by

---

[1] The facts as recounted here are undisputed by the parties unless otherwise indicated.

Hurricane Sandy. The City of New York contracted with Triton Structural Concrete ("Triton") to repair the damage, and Triton in turn subcontracted with Coastal to actually perform the repairs.

To conduct the work, Coastal chartered the MIKE B, a spud barge, from Sterling Equipment, Inc. ("Sterling"). The MIKE B was to serve as a base for a crane to perform work on the pier. A spud barge holds itself in place by lowering its spuds (in the case of the MIKE B, steel pipes measuring sixty-five feet in length) into the sea floor. The spuds are housed within spud wells, which serve as a sleeve around the spud and are welded to the barge's deck and the bottom of the barge. This structure prevents the barge from moving horizontally, while still allowing it to move up and down with the sea. The MIKE B had two spuds, which were located on its starboard side in aft and forward positions.

Coastal and Sterling signed an agreement (the "Charter Agreement") for the barge on March 28, 2013, for a charter period between April 7, 2013 and June 6, 2013. The Charter Agreement included an address of "1904 Surf

Avenue, Brooklyn[,] NY 11224" under the heading of "Job Site." Joint App'x 1409. Under the terms of the Charter Agreement, Coastal was obligated to secure both hull insurance, insuring against damage to or loss of the MIKE B, and protection and indemnity insurance covering third-party claims, including property damage. Coastal had a preexisting policy with Atlantic that covered other vessels for the period of January 2013 to January 2014; as a result, Coastal sought to add coverage of the MIKE B to this policy. The policy included a condition that "the vessel shall be confined to [the]: Coastal and Inland waters of the United States in and around Brooklyn, NY." Joint App'x 1445.

On Monday, April 1, 2013, Coastal's insurance broker, George Zerlanko of Global Indemnity Insurance Agency, Inc. ("Global"), emailed Dorothy Schmidt of All Risks, Ltd. ("All Risks") requesting that the MIKE B be added to the policy.[2] On Friday, April 5, 2013 at 2:17 p.m., Schmidt

_____

[2] All Risks is a "licensed insurance broker." Joint App'x 2438. Atlantic and Coastal dispute the nature of the relationship between All Risks and the parties. Atlantic

emailed Mark Fairchild of Atlantic asking for a quote to add the MIKE B. Schmidt's email included the Charter Agreement as an attachment, including the job site address at 1904 Surf Avenue. At 3:36 p.m., less than ninety minutes later, Fairchild responded with a quote; in addition to the premiums for the additional coverages, the quote included a requirement that Coastal assume a higher deductible than that provided for in the Charter Agreement, but otherwise contained no conditions for the extension of coverage and did not request further information.[3] Three minutes later, Schmidt sent along Atlantic's quote to Zerlanko at Global; forty minutes after that, Zerlanko responded, indicating that Coastal would accept the quote, including the higher deductible. Finally, ten minutes later, at 4:27

characterizes All Risks as "Coastal's insurance broker." Appellant Br. at 18. Coastal claims instead that All Risks was a "licensed agent with [International Marine Underwriters (IMU)]," and that Atlantic is "a writing company for IMU." Appellee Br. at 15 (quoting Joint App'x 835–36 (deposition testimony of Dorothy Schmidt)). We need not resolve whether Schmidt acted as Atlantic's agent because Atlantic bound coverage directly through its own employee, Mark Fairchild, as indicated in the text, *infra*.

[3] Specifically, Fairchild quoted a $10,000 deductible — to match that of the other vessels under Coastal's existing policy — while noting that the Charter Agreement called for no higher than a $5,000 deductible.

9

p.m., Schmidt forwarded the acceptance of the quote back to Fairchild at Atlantic, indicating that coverage should be bound.

Three days later, on Monday, April 8, an expert marine surveyor, Jason Meyerrose, conducted an in-water survey of the barge at Sterling's yard in Staten Island at Coastal's request, after which he prepared a survey titled "Preliminary Advices for Insurance Underwriting Purposes." Joint App'x 1390. Meyerrose's survey declared the vessel's overall condition to be "fair for age and past services" and valued the vessel at $400,000.[4] Joint App'x 1391. The survey also stated that "the hull and equipment of the subject vessel are in satisfactory condition for operation in inland waters." *Id.* Meyerrose forwarded the survey to an employee of Coastal, Kristine Morehouse, later that day. In his cover email, Meyerrose indicated that Sterling needed to make some minor repairs before service, while also

---

[4] The MIKE B had previously been surveyed by Meyerrose's father and partner at the firm, Rick Meyerrose, in 2012; at that point, Rick Meyerrose had valued the barge at $400,000, and Jason Meyerrose did not believe the value had changed in the subsequent year.

10

asking: "This barge will be working in protected waters at Coney Island correct, not on the Ocean / inlet side????" Joint App'x 1388–89. Morehouse responded a few minutes later by stating: "Yes that is correct it will be in protected waters at Coney Island, not in the Ocean." Joint App'x 1388. Morehouse subsequently forwarded the preliminary survey to Zerlanko at Global, who then forwarded it to Schmidt at All Risks, who passed it finally on to Fairchild at Atlantic. Morehouse's email and the subsequent communications all included Meyerrose's question, but none included Morehouse's response.

Coastal took possession of the MIKE B and towed it, first to a construction yard where a fifty-ton crane was installed, and then, on Thursday, April 11, to the job site at the pier. The barge was then "spudded" to the seabed to hold it in place next to the pier. That evening, Coastal's on-

site supervisor, Eric Gundersen, checked the weather forecast, which called for rain and one-foot seas.[5]

When he returned at 7:00 a.m. the next morning, Friday, April 12, Gundersen saw the waves were higher than forecasted, "2 to 4" feet and coming "from the ocean" to the south. Joint App'x 1242–43.[6] Gundersen testified that he promptly called Miller's Launch ("Miller"), a tug company with which Coastal had pre-arranged to have a tug available "within an hour at all times," to send over a tug. Joint App'x 1245.[7] The purpose of the

---

[5] Gundersen testified in a deposition, but not at trial. His deposition was admitted at the trial, however. Atlantic objected to the use of Gundersen's testimony below and continues to raise objections to it on appeal. For reasons discussed in more detail below, we find there was no error in the district court's consideration of Gundersen's testimony.

[6] Coastal's weather expert, Dr. Austin Dooley, testified that the waves would have been "4 to 6 feet" in the area of the pier on April 12, Joint App'x 1141, 1166, while Atlantic's expert, Trevor Bevens, testified that the waves would not have been more than two feet, Joint App'x 1177–78.

[7] There is additional testimony in the record that indicates the tug would be available within two hours, rather than one. Joint App'x 354. The record is unclear as to whether it was standard operating procedure for Coastal to contract to have a tug available on such short notice, or if Coastal made such an arrangement specifically due to the MIKE B's location and associated operational conditions, including weather.

12

standby tug was to tow the MIKE B away from the pier if warranted by sea conditions. Gundersen then boarded the barge, where he remained for "45 minutes to an hour" to inspect whether the waves were harming it and to ensure everything was "tied down"; Gundersen testified that the barge seemed to be in safe condition at that time but was starting to "mov[e] pretty good" as the seas continued to get rougher, and he called Miller again to check on the tug's status. Joint App'x 1244–46. Gundersen subsequently returned to the barge to further secure items on the deck, spending an hour to an hour and a half on board; at that point he observed that one of the spuds appeared to have bent. By the time the tug finally arrived in the late morning, Gundersen had learned the aft spud well had failed and water was entering the barge.

That afternoon, Coastal deployed floating containment booms to protect against any oil spill from the then-listing barge; because the barge had already struck the pier, Miller also worked to anchor the barge to keep it from damaging the pier further. Coastal and Miller — and eventually the

13

crane manufacturer — also prepared to remove the crane from the barge's deck, with work continuing throughout the weekend. Coastal at that time informed Global that the barge was in trouble, and Global advised that Coastal should do whatever was in the "normal range to keep the barge afloat." Joint App'x 357–58. By Monday morning, April 15, the crane was removed; however, by Tuesday morning, April 16, because of the ongoing danger the barge posed to the pier and the high cost of the thus-far unsuccessful pumping effort, Coastal chose to allow the MIKE B to sink to the sea floor. By April 17, the barge was fully submerged and then, in June 2013, was removed for scrap purposes.

Atlantic sent a marine surveyor, Alan Colletti, to investigate the incident on Monday, April 15; he returned twice that week, on April 16 and April 17, and submitted reports to Atlantic estimating the costs of repairs and evaluating the cause of the loss. In the interim, Atlantic wrote to Coastal on April 16 reserving its rights under the insurance policy for claims related to the MIKE B and did so again on April 25.

14

On May 24, 2013, Atlantic wrote to Coastal declining coverage for the MIKE B. On October 17, 2013, Coastal requested payment of the $400,000 due under the policy for the loss of the barge, stating that the vessel's loss was "caused by perils of the seas." Joint App'x 1621–23. Atlantic again declined payment on February 3, 2014. On August 21, 2014, Coastal again wrote to Atlantic, this time also seeking payment under the policy's protection and indemnity coverage for damage to the pier and the costs of attempting to save the barge; Coastal also reiterated its claim related to the loss of the barge itself. All were denied by Atlantic. In total, Coastal claimed over $1.2 million under the policy.

**B.    Procedural Background**

On December 19, 2014, Atlantic filed this action in the Eastern District of New York. An amended complaint was filed on December 30, 2014.[8] The complaint sought a declaratory judgment that the policy covering the MIKE

---

[8] References to the "complaint" in this opinion are to this amended complaint.

B was void *ab initio* or, in the alternative, that there was no coverage under the policy's terms.[9]  As relevant here, Atlantic alleged that the policy was void due to the fact that Coastal had violated its admiralty law duty of *uberrimae fidei* (utmost good faith) by failing to disclose a material risk, and had breached either the express or implied warranties of seaworthiness. Alternatively, Atlantic alleged that the loss of the MIKE B was not due to a peril covered under the policy.

Judge Wexler presided over the case, including a bench trial conducted over seven days in October and November 2017.  The trial was limited to the question of whether Atlantic's declination of coverage was proper and, if not, the extent of damages owed by Atlantic to Coastal and/or Sterling under the policy.  Resolution of other issues, such as potential damages owed by Coastal to Atlantic or the resolution of the third-party

---

[9] Coastal and Sterling asserted counterclaims against Atlantic and cross claims against each other; Sterling also asserted a third-party claim against Global, and Global asserted a third-party claim against All Risks.

and cross claims, was postponed. Though most witnesses presented live testimony, others did not appear in court despite attempts to subpoena them, and the court accepted their testimony from depositions in video or transcript form. Of particular relevance to this appeal, Gundersen, Coastal's on-site supervisor, apparently ignored two subpoenas for trial testimony, and Judge Wexler instead admitted Gundersen's deposition testimony into evidence. In March 2018, after conclusion of the trial but before he had issued a decision in the case, Judge Wexler passed away, and the case was reassigned to Judge Azrack in April 2018.

Upon taking over the case, Judge Azrack held a telephone conference with the parties on July 10, 2018, and one of its topics was whether any of the parties sought to recall witnesses under Federal Rule of Civil Procedure 63.[10] Atlantic's counsel suggested that the court "may wish to hear from"

---

[10] Rule 63 provides as follows:

> If a judge conducting a hearing or trial is unable to proceed, any other judge may proceed upon certifying familiarity with the record and determining that the case may be completed without prejudice to the

Gundersen; however, when Judge Azrack asked why Gundersen would be likely to honor a third subpoena and appear on recall, Atlantic's counsel did not press his request for Gundersen to testify or seek to exclude Gundersen's deposition testimony.[11]

---

parties. In a hearing or a nonjury trial, the successor judge must, at a party's request, recall any witness whose testimony is material and disputed and who is available to testify again without undue burden. The successor judge may also recall any other witness.

Fed. R. Civ. P. 63.

[11] The full exchange between Judge Azrack and Atlantic's counsel (Attorney Carbin, misspelled as Corbin in the transcript) concerning the recall of witnesses is reproduced below:

MR. CORBIN [sic]: I note that your request was pursuant to Rule 63 and in particular, whether any of the parties thought that a trial witness should be recalled.
THE COURT: Right.
MR. CORBIN: And in that regard, I would suggest, your Honor, that from plaintiff's perspective, the only witness that your Honor may wish to hear from is a witness put forward by the defendant Coastal. He was their job superintendent for the job at the time of the casualty. In fact, he's an ex-employee, as I understand it. He was subpoenaed twice by the defendant Coastal and refused to honor either of those subpoenas. And over our objection, Judge Wexler accepted his deposition testimony to be read in. We had also objected to that testimony being read in because Mr. Gundersen, the name of the witness is Eric Gundersen. Mr. Gundersen had been previously convicted of attempted murder of a New York City Police Officer and had served time for that conviction. But as I said, when

18

On September 30, 2018, Judge Azrack issued her findings of fact and conclusions of law, stating that they were based on her "review of the record and the post-trial submissions." *Atl. Specialty Ins. Co.*, 368 F. Supp. 3d at 434. Judge Azrack found that Atlantic improperly denied coverage to Coastal under both the hull insurance policy for the loss of the MIKE B and the barge salvage costs, and the protection and indemnity policy for pier damage. Turning to damages, the court awarded Coastal the full $400,000 claimed

---

he was twice subpoenaed by Coastal to appear and testify, he did not honor the subpoenas, did not appear in court and instead, Judge Wexler accepted some of hi[s] deposition testimony and I think the Court may be interested to hear from Mr. Gundersen directly rather than his deposition testimony.
THE COURT: But what makes you think Mr. Gundersen is going to appear now as opposed — since he didn't appear before?
MR. CORBIN: Fair question, your Honor. I do not know. I think it's a fair observation.
THE COURT: All right.
MR. CORBIN: I think the — rather than take his deposition testimony, I think the Court should have insisted on his appearance.
THE COURT: Okay, I understand but what you were referring to was the fact that he twice ignored subpoenas, correct?
MR. CORBIN: Yes.
THE COURT: Okay. All right. Anything else? Okay.

Joint App'x 2557–58.

for the loss of the MIKE B; $394,725.13 for salvage costs (slightly less than the $400,000 Coastal sought for such costs); and the full $402,470.51 claimed for the damage to the pier. *Id.* at 449–53.

Atlantic timely appealed from Judge Azrack's findings of fact and conclusions of law, claiming error on a variety of legal, factual, and evidentiary grounds.

**II.     STANDARD OF REVIEW**

On appeal from a bench trial, conclusions of law — as well as mixed questions of law and fact — are reviewed *de novo*, while findings of fact are reviewed for clear error. *See, e.g.*, *Beck Chevrolet Co. v. Gen. Motors LLC*, 787 F.3d 663, 672 (2d Cir. 2015).[12]  "Under the clear error standard, we 'may not

---

[12] Evidentiary decisions, meanwhile, are subject to the abuse of discretion standard, under which error occurs only where the district court "bases its ruling on an erroneous view of the law or on a clearly erroneous assessment of the evidence, or renders a decision that cannot be located within the range of permissible decisions." *United States v. Hendricks*, 921 F.3d 320, 328 n.37 (2d Cir. 2019) (citation and alterations omitted); *see also United States v. Apple, Inc.*, 791 F.3d 290, 313 (2d Cir. 2015) ("Following a bench trial, . . . [t]he district court's evidentiary rulings . . . are reviewed for abuse of discretion." (citations omitted)). Even where that standard is met, however, reversible error occurs only where an erroneous ruling "also affects a party's substantial rights." *Boyce v. Soundview Tech. Grp., Inc.*, 464 F.3d 376, 385 (2d Cir. 2006) (citation omitted).

reverse [a finding] even though convinced that had [we] been sitting as the trier of fact, [we] would have weighed the evidence differently.'" *Mobil Shipping & Transp. Co. v. Wonsild Liquid Carriers Ltd.*, 190 F.3d 64, 67 (2d Cir. 1999) (alterations in original) (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 574 (1985)). "Rather, a finding is clearly erroneous only if 'although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed.'" *Id.* at 67–68 (quoting *Anderson*, 470 U.S. at 573).

Atlantic argues that the particular circumstances of this case merit departure from that standard of review. Specifically, Atlantic contends that, because Judge Azrack was not present at trial, her factual "determinations are not entitled to deference" and should be reviewed *de novo*. Appellant Br. at 15. We disagree and hold that the factual findings of a successor judge who has certified her familiarity with the record in accordance with Federal Rule of Civil Procedure 63 are entitled to the same deference that would be due if the findings had been made by the district judge who presided over

the taking of the evidence, even when the successor judge relies entirely on a documentary record.

Such a conclusion is supported by the text of Rule 52(a)(6), which provides that "[f]indings of fact, *whether based on oral or other evidence*, must not be set aside unless clearly erroneous." [13] Fed. R. Civ. P. 52(a)(6) (emphasis added). The Rule makes clear that a reviewing court shall not apply a more stringent standard than "clearly erroneous" to a finding of fact due to the form of evidence on which the factual finding is based. Instead, the deference to the factfinder embodied in Rule 52 "is the rule, not the exception." *Anderson*, 470 U.S. at 575. And, as the Supreme Court has stated, the rationale for deference is not merely the trial court's superior ability to make credibility determinations; instead, the clear error standard takes into account the trial court's expertise in fact-finding as well as a concern over

---

[13] The Rule continues to provide that "the reviewing court must give due regard to the trial court's opportunity to judge the witnesses' credibility." Fed. R. Civ. P. 52(a)(6). As the Supreme Court has stated, however, this additional language "does not alter [the Rule's] clear command" that all factual findings, regardless of their evidentiary basis, are owed deference by the reviewing court. *Anderson*, 470 U.S. at 574.

the "huge cost" in judicial resources that a more searching review by appellate courts would entail for an only "negligibl[e]" improvement in accuracy. *Id.* at 574–75.

The drafting history of the Rule further supports our interpretation. Rule 52 was amended in 1985, with the addition of the phrase "whether based on oral or other evidence," in an effort to make explicit that deference was owed to a trial court's factual findings regardless of the form of evidence on which they were based. *See* Amendments to Rules, 105 F.R.D. 179, 204–05, 221–23 (1985); *see also* 9C Charles A. Wright & Arthur R. Miller, Federal Practice & Procedure § 2571 (3d ed. 2019) ("An amendment in 1985 made it clear that the standard for appellate review is the same for oral and documentary evidence."). Prior to the amendment, some courts of appeals had applied a lesser level of deference to factual findings where the "trial court's findings [did] not rest on demeanor evidence and evaluation of a witness' [sic] credibility." Amendments to Rules, 105 F.R.D. at 222 (Advisory Committee's Note) (citing, for example, *Marcum v. United States*,

23

621 F.2d 142, 144–45 (5th Cir. 1980) (reviewing court more likely to find clear error where findings based on written evidence); and *Taylor v. Lombard*, 606 F.2d 371, 372 (2d Cir. 1979) (reviewing court "may make [its] own independent factual determination" based on written record)). However, as the Advisory Committee noted in explaining the amendment, deference to the district court's factual findings was based not only on the court's ability to weigh credibility, but also on a "public interest in the stability and judicial economy that would be promoted by recognizing that the trial court, not the appellate tribunal, should be the finder of the facts." *Id.* at 223. These objectives were determined to be sufficient bases for deferring to the district court's findings of fact regardless of the nature of the evidence, and the absence of credibility determinations on documentary evidence was regarded as an insufficient reason for an appellate court to conduct a more searching review of factual findings based on such evidence.

As a result, since at least 1985 this Court has routinely applied the clear error standard in reviewing factual findings based on documentary

evidence, as well as those based on witness credibility. *See, e.g., Connors v. Conn. Gen. Life Ins. Co.*, 272 F.3d 127, 135 (2d Cir. 2001); *see also Koam Produce, Inc. v. DiMare Homestead, Inc.*, 329 F.3d 123, 126 (2d Cir. 2003). And while we have not previously had occasion to consider this approach where the factual findings are of a successor judge, we see no reason to depart from the clear directive of Rule 52 in these circumstances. A successor judge who has certified his or her familiarity with the record and proceeds to make findings of fact based on that record conducts essentially the same analysis as a trial judge evaluating written or other documentary evidence. And the considerations that underlie deference to a district court's findings of fact — a recognition of the fact-finding expertise of the district court and concern over judicial stability and economy — apply with equal force to the findings of a successor judge.

Moreover, Rule 63, which governs the procedures to be followed by successor judges, provides an opportunity to recall witnesses to any litigant who believes that the credibility of a particular witness is material to the

accuracy of a successor judge's factual findings and that such credibility may be properly assessed only via new testimony. Rule 63 provides that, if any party so requests, the successor judge "*must . . .* recall any witness whose testimony is material and disputed," provided that witness "is available to testify again without undue burden." Fed. R. Civ. P. 63 (emphasis added). In addition, the Rule also provides that the successor judge has the discretion to recall any other witness. *Id.* Rule 63's mandatory and discretionary recall requirements are important tools to protect against an incomplete or inadequate record. As the D.C. Circuit has noted, Rule 63 seeks to "[b]alanc[e] efficiency and fairness." *Mergentime Corp. v. Wash. Metro. Area Transit Auth.*, 166 F.3d 1257, 1262 (D.C. Cir. 1999). While the recall provisions contribute to the completeness of the district court proceedings, once those requirements are satisfied, Rule 63 permits the successor judge to make factual findings and thus "complet[e] interrupted trials without causing 'unnecessary expense and delay.'" *Id.* (quoting Fed. R. Civ. P. 63 advisory committee's note to 1991 amendment).

26

We find Atlantic's arguments to the contrary to be unavailing: their focus on Judge Azrack's determination that it was unnecessary to rehear the evidence as its basis for *de novo* review cannot be reconciled with the text of Rules 52 and 63, and they rest on the same reasoning rejected by the Supreme Court in *Anderson* and addressed by the 1985 amendment to Rule 52. Atlantic could have required the recall of any of the prior witnesses — including Gundersen — whose testimony it now claims Judge Azrack should not have relied upon, but it chose not to do so.[14]

For these reasons, we review Judge Azrack's factual findings for clear error, and will reverse them only if we are "left with the definite and firm conviction that a mistake has been committed." *Anderson*, 470 U.S. at 573.

---

[14] As discussed in more detail below, Atlantic failed to request the recall of the experts whose testimony it challenges, and its suggestion to the district court that it "may wish to hear from" Gundersen, Joint App'x 2557, likewise did not qualify as a request for a mandatory recall of a witness under Rule 63.

## III.    DISCUSSION

Turning to the merits of its appeal, Atlantic raises five primary grounds for error, in addition to challenging numerous evidentiary decisions made by Judges Wexler and Azrack.  Atlantic's primary arguments are that Judge Azrack erred in finding that: (1) Coastal did not breach its duty of *uberrimae fidei*, and thus the policy was not void; (2) Atlantic failed to prove the MIKE B was unseaworthy; (3) the loss of the MIKE B was due to a "peril of the sea" and thus was covered by the policy; (4) Coastal was entitled to damages for contractual payments withheld by its contractor for repairs to the Steeplechase Pier; and (5) Coastal proved its damages using only a summary spreadsheet of invoices, as well as unauthenticated invoices, as evidence.  We address each claim in turn.

### A. Coastal's Duty of *Uberrimae Fidei*

Atlantic first argues that Coastal breached its duty of *uberrimae fidei*, or utmost good faith, because "the risk Coastal presented to Atlantic . . . was not the actual risk."  Appellant Br. at 16.  *Uberrimae fidei* is a doctrine in admiralty law that requires "the party seeking insurance . . . to disclose all

28

circumstances known to it which materially affect the risk." *Fireman's Fund Ins. Co. v. Great Am. Ins. Co.*, 822 F.3d 620, 633 (2d Cir. 2016) (quoting *Folksamerica Reinsurance Co. v. Clean Water of N.Y., Inc.*, 413 F.3d 307, 311 (2d Cir. 2005)). The doctrine "does not require the voiding of the contract unless the undisclosed facts were material and relied upon." *Id.* at 638 (quoting *Puritan Ins. Co. v. Eagle S.S. Co. S.A.*, 779 F.2d 866, 871 (2d Cir. 1985)). "Further, a minute disclosure of every material circumstance is not required. The assured complies with the rule if he discloses sufficient to call the attention of the underwriter in such a way that, if the latter desires further information, he can ask for it." *Puritan*, 779 F.2d at 871 (alteration omitted). The materiality of the information and the underwriter's reliance on the information are distinct elements to be proven, *id.*, and the burden of proof is on the insurer to show that there was a breach of this duty, *see id.* at 872; *see also Contractors Realty Co. v. Ins. Co. of N. Am.*, 469 F. Supp. 1287, 1293–94 (S.D.N.Y. 1979). Finally, because the duty is imposed "so that the insurer can decide for itself . . . whether to accept the risk," the duty to disclose

ceases once the insurer has accepted the risk by binding coverage. *Knight v. U.S. Fire Ins. Co.*, 804 F.2d 9, 14 (2d Cir. 1986).

Atlantic argues that Coastal breached this duty by failing to disclose two material facts: first, that the barge would operate on the southern side of Coney Island facing the ocean, and, second, that the barge was "extensively corroded and deteriorated." Appellant Br. at 16. Because each of these issues is factual in nature, we apply the clearly erroneous standard of Rule 52(a)(6). *See Puritan*, 779 F.2d at 871 (applying clear error standard to factual findings bearing on breach of *uberrimae fidei*). In doing so, we find that the district court did not err in finding that Coastal did not breach that duty.

First, the district court did not clearly err in concluding that Coastal disclosed information concerning the actual location of the barge sufficient to comply with its duty. As the district court correctly noted, at the time Atlantic bound coverage, the policy covered operation of the barge in "[c]oastal and [i]nland waters of the United States in and around Brooklyn,

30

NY."  Joint App'x 1445; *see also Atl. Specialty Ins. Co.*, 368 F. Supp. 3d at 437. This stated navigation limit encompassed the job site at the Steeplechase Pier.  And Atlantic's Fairchild testified that upon receiving the Charter Agreement as part of Coastal's request for coverage, which included a Brooklyn address — 1904 Surf Avenue — as the Job Site, he "looked at" the address only to confirm "it was within the navigation [limit] of the policy." Joint App'x 334.  Because the record shows that Coastal disclosed the barge's operational location and Atlantic relied on this information only to confirm that the barge would be operated within the policy's navigational limits — and thus face the risks inherent in operating within those limits — Atlantic failed to prove a breach by Coastal of its duty of *uberrimae fidei* in regards to use of the barge at the Steeplechase Pier.

Likewise, we are not persuaded by Atlantic's argument that Coastal violated its duty by failing to more fully disclose the condition of the barge. As an initial matter, Atlantic did not demonstrate that Coastal knew and did not disclose any material information concerning the MIKE B's condition

31

prior to the binding of coverage on April 5. Coastal obtained the preliminary survey conducted by Meyerrose only on Monday, April 8 — three days after the date on which coverage was bound — and, in any event, that survey concluded that the barge's condition was "fair for age and past services" and the barge had recently been repaired. Joint App'x 1391. And though Atlantic cites to a number of "deficiencies" identified in Meyerrose's "On Hire Survey," which was based on his April 8 inspection, Coastal did not receive that survey until April 15.[15] Likewise, the statements of Coastal's employees cited by Atlantic as evidence of Coastal's knowledge of and failure to disclose material information about the barge's condition all were made after coverage was bound, with many being made only after the barge had already been exposed to and damaged by the high seas. We thus reject Atlantic's argument that the district court clearly erred in finding that

---

[15] We note also that Meyerrose did not mention in his April 15 On Hire Survey nor amended his preliminary survey to reflect that the barge was located on the ocean side of Coney Island.

32

Coastal did not fail to disclose circumstances that materially affected the risk undertaken by Atlantic.

**B.    Seaworthiness of the MIKE B**

Atlantic's second argument is that the district court clearly erred in concluding that Atlantic failed to prove that the MIKE B was unseaworthy. Atlantic first takes issue with the district court placing the burden of proof on it, the insurer, contending that Coastal instead bore the burden to prove that the MIKE B was seaworthy. Though this court has not previously held so explicitly, we agree with the consensus of authority that places that burden on the insurer. *See, e.g.*, *Darien Bank v. Travelers Indem. Co.*, 654 F.2d 1015, 1021 (5th Cir. Unit B Aug. 1981); *Fed. Ins. Co. v. PGG Realty, LLC*, 538 F. Supp. 2d 680, 694 (S.D.N.Y. 2008); *Cont'l Ins. Co. v. Lone Eagle Shipping Ltd. (Liberia)*, 952 F. Supp. 1046, 1067 (S.D.N.Y. 1997) ("The burden is on the insurer to prove unseaworthiness."), *aff'd*, 134 F.3d 103 (2d Cir. 1998) (per curiam); *see also* 2 Thomas J. Schoenbaum, Admiralty & Maritime Law § 19:16 (6th ed. 2019) ("As a general rule, there is a presumption that the

33

vessel was seaworthy, so the burden of proving unseaworthiness is on the insurer.").[16]

Turning to the district court's factual determinations concerning the seaworthiness of the MIKE B, we also review for clear error. *See Raphaely Int'l, Inc. v. Waterman S.S. Corp.*, 972 F.2d 498, 503 (2d Cir. 1992).[17] Judge Azrack made a number of findings concerning the MIKE B's seaworthiness, ultimately crediting Coastal's and Sterling's experts' testimony over the expert testimony and evidence put forth by Atlantic. *Atl. Specialty Ins. Co.*,

---

[16] The district court concluded, in the alternative, that Coastal had proven by a preponderance of the evidence that the MIKE B was, in fact, seaworthy. *See Atl. Specialty Ins. Co.*, 368 F. Supp. 3d at 447.

[17] Earlier cases of this Court have suggested that a "conclusory finding of seaworthiness" may be entitled to slightly less deference on appeal, though even under that standard the finding is nevertheless "entitled to great weight and will ordinarily stand unless the lower court manifests an incorrect conception of the applicable law." *Mobil Shipping & Transp. Co.*, 190 F.3d at 67 (citing *In re Marine Sulphur Queen*, 460 F.2d 89, 97-98 (2d Cir. 1972)). As was pointed out in *Mobil Shipping*, however, more recent cases including *Raphaely* have adopted the clear error standard. *Id.* at 67–68. To the extent these standards are meaningfully different, we conclude, as the court did in *Mobil Shipping*, that we need not settle this question: as discussed below, the district court made extensive findings of fact concerning the seaworthiness of the barge, and we would defer to them under either standard.

368 F. Supp. 3d at 446–47. Atlantic primarily disputes Judge Azrack's weighing of the evidence and her decision to credit Coastal's and Sterling's experts.

At the outset, we disagree with Atlantic's contention that, because Judge Azrack did not recall any witnesses under Rule 63, she was not entitled to weigh the evidence or credit one expert over another. As discussed above, no such restriction is found in the text of Rule 63, and the Rule is clear that a successor judge is obligated to recall a witness only when a party has so requested, with the decision to recall other witnesses left to the successor judge's discretion. Judge Azrack found that "[t]he parties have chosen not to recall any witnesses." *Atl. Specialty Ins. Co.*, 368 F. Supp. 3d at 434.

The record supports this finding: Atlantic did not request the recall of any of the experts or other witnesses, and its suggestion that Judge Azrack "may wish to hear from" Gundersen, Joint App'x 2557, without more, does not rise to the level of a recall request triggering the obligations of Rule 63.

35

Atlantic's reliance on *Mergentime Corp.*, therefore, is misplaced. There, the D.C. Circuit vacated a successor judge's decision because he failed to recall witnesses after the appealing party specifically requested that a damages expert be recalled and also offered to submit a list of other witnesses that should be recalled. *See* 166 F.3d at 1266. The court concluded that "the plain language of Rule 63 control[led]" in finding that the successor judge should have granted the appealing party's request. *Id.* We agree that the plain language of Rule 63 governs here as well, imposing an obligation to recall witnesses on a successor judge only after a party has so requested. After failing to request the recall of these witnesses below, then, Atlantic cannot now claim error on the basis of Rule 63.

We turn then to Atlantic's substantive arguments that the district court erred in finding that Coastal had not breached either the warranty of seaworthiness explicitly provided in the insurance policy or the warranty of seaworthiness implied under maritime law. Warranties of seaworthiness, whether express or implied, require a vessel to be able "adequately to

36

perform the particular services required of her on the voyage she undertakes." *GTS Indus. S.A. v. S/S "Havtjeld"*, 68 F.3d 1531, 1535 (2d Cir. 1995). While the warranty is "absolute" — i.e., "imposed regardless of fault" and irrespective of "the owner's knowledge of the alleged unseaworthy conditions" — the meaning of seaworthiness is "relative" and "varies with the vessel involved and the use for which the vessel is intended." *PGG Realty*, 538 F. Supp. 2d at 693; *see also* 2 Schoenbaum, *supra*, § 19:16 ("[T]he standard is not perfection but reasonableness.").

With this standard in mind, we find Atlantic's claim of unseaworthiness to be without merit. In concluding that Atlantic had failed to prove that the MIKE B was unseaworthy, Judge Azrack reasonably credited Meyerrose's testimony and the findings of his preliminary survey, which stated that the vessel was "in satisfactory condition for operation in inland waters," Joint App'x 1391, noting that Meyerrose was "the only qualified person[] to have conducted a survey of the MIKE B before the incident," *Atl. Specialty Ins. Co.*, 368 F. Supp. 3d at 440. Similarly, Judge

Azrack's decision to credit Coastal's and Sterling's experts over Atlantic's concerning the condition of the barge and the cause of its loss is reasonably based on a comparison of the experts' qualifications and testimony. *See id.* at 441 (noting, for example, that Atlantic's expert Colletti had only limited experience with spud barges and finding material portions of his testimony to be "imprecise and not reliable").[18]

In addition to her conclusion concerning the barge's seaworthy condition, Judge Azrack found, and the record supports, that Coastal had in place an inclement weather plan to have a tug available on one- or two-hour notice to assist in lifting the MIKE B's spuds and moving the barge. Indeed, the record supports a finding that, had the tug arrived on time, the spud

---

[18] Atlantic contends also that Judge Wexler had already been "apparently persuaded" of the MIKE B's unseaworthiness when he barred Atlantic from showing further photos of the MIKE B's hull during trial. *See* Appellant Br. at 32–37. Based on this conclusion, Atlantic suggests it was error for Judge Azrack to find that Atlantic had not met its burden of proof. However, a review of the trial transcript compels only the conclusion that Judge Wexler, having already reviewed a number of photographs, found further testimony on potential holes in the barge to be cumulative and minimally probative. *See* Joint App'x 596.

may not have bent, as several hours passed between when Miller was first called and when the tug finally arrived, during which the spud bent and its well tore, causing the loss. To the extent it may bear on the MIKE B's seaworthiness, then, Coastal's contingency plan was reasonable under the circumstances reasonably known at the time; the fact that the tug took far longer to arrive than planned, coupled with the unanticipated severity of the weather and sea conditions, did not render the MIKE B unseaworthy.

Under the clear error standard applicable to determinations of seaworthiness, we reverse only where we are "left with the definite and firm conviction that a mistake has been committed." *Mobil Shipping & Transp. Co.*, 190 F.3d at 67–68. In light of the district court's extensive findings and their support in the record, we cannot find that any such mistake has been committed here.

**C.    Covered Peril**

Atlantic's third claimed error concerns Judge Azrack's finding that Coastal had met its burden in proving that the loss of the MIKE B was

39

proximately caused by a peril of the sea as covered in the insurance policy.[19]

A peril of the sea is a maritime insurance term, defined with reference to "those perils which are peculiar to the sea, and which are of an extraordinary nature or arise from irresistible force or overwhelming power." *R.T. Jones Lumber Co. v. Roen S.S. Co.*, 270 F.2d 456, 458 (2d Cir. 1959). Our cases have applied the term to "damage [] done by the fortuitous action of the sea," *N.Y., New Haven & Hartford R.R. Co. v. Gray*, 240 F.2d 460, 464 (2d Cir. 1957), and we have held the term includes "occasional visitations of the violence of nature, like great storms, even though these are no more than should be expected. . . . Indeed, fortuitous actions of the sea much less violent than storms have been held to be within its intended

---

[19] The Policy reads, in relevant part:

> PERILS: Touching the Adventures and Perils which the Underwriters are contented to bear and take upon themselves, they are of the Seas . . . and of all other like Perils, Losses and Misfortunes that have or shall come to the Hurt, Detriment or Damage of the Vessel, or any part thereof . . . .

Joint App'x 1431.

coverage." *Cont'l Ins. Co. v. Hersent Offshore, Inc.*, 567 F.2d 533, 535 (2d Cir. 1977) (citation omitted). For example, we have found high swells caused by a passing freighter to constitute a covered peril of the sea. *See Allen N. Spooner & Son, Inc. v. Conn. Fire Ins. Co.*, 314 F.2d 753, 756 (2d Cir. 1963), *cert. denied*, 375 U.S. 819. The determination of whether certain weather or sea conditions constitute a peril of the sea "is a fact-intensive inquiry which requires examination of the type of vessel, the location of the vessel, the expectability [sic] of the weather, as well as its severity." *Lone Eagle Shipping*, 952 F. Supp. at 1061; *see also Darien Bank*, 654 F.2d at 1020 ("[W]hether or not an occurrence constitutes an extraordinary risk so as to be a peril of the sea is not of itself an absolute and unvarying thing, but is dependent on the circumstances of the case and the character of the vessel insured." (citation omitted)).

In conducting this inquiry, Judge Azrack made detailed findings and concluded that Coastal had met its burden of showing that "wind and sea conditions had generated waves . . . averaging 4 to 6 feet when the MIKE B

41

was lost" and that these conditions "were the proximate cause of the spud well tearing, initial ingress of water, and the loss of the MIKE B." *Atl. Specialty Ins. Co.*, 368 F. Supp. 3d at 447–48. Atlantic raises two sets of challenges to these findings. First, it raises evidentiary challenges, arguing that Judge Wexler should not have allowed the deposition testimony of Gundersen to be considered, that Judge Azrack should not have credited Gundersen's testimony, and that it was error for Judge Azrack to "refus[e]" to recall Gundersen. *See* Appellant Br. at 46–48. Second, Atlantic challenges Judge Azrack's ultimate conclusions, primarily arguing that Coastal did not prove the conditions were "extraordinary" and that it was the MIKE B's unseaworthiness instead that proximately caused the loss. *Id.* at 48–51.

We disagree with each argument. First, Judge Wexler's decision to consider Gundersen's testimony certainly was not an abuse of discretion. Federal Rule of Evidence 804 permits the admission of former testimony, including that "given as a witness at a . . . lawful deposition," where the witness is unavailable to testify. Fed. R. Evid. 804(b)(1)(A). And, as relevant

here, a witness is considered unavailable where he or she is "absent from the trial . . . and the statement's proponent has not been able, by process or other reasonable means, to procure . . . the [witness]'s attendance." Fed. R. Evid. 804(a)(5). Given Gundersen's refusal to appear under subpoena and that the testimony was taken under oath during a deposition, the admission of the evidence instead appears to be a faithful application of Federal Rule of Evidence 804. Next, we do not find error in Judge Azrack's decision to credit Gundersen's testimony: the inconsistencies identified by Atlantic are at most minor, and in many cases — such as Gundersen's statements concerning the height of the seas on April 12 — the credited testimony is supported by other evidence in the record.[20] And, lastly, we have already concluded that under Rule 63, Judge Azrack was under no obligation to

---

[20] Atlantic also argues that Judge Wexler should not have admitted Gundersen's testimony and Judge Azrack should not have credited it due to Gundersen's prior convictions for assault. *E.g.*, Appellant Br. at 47. Judge Azrack's exclusion of evidence of these prior convictions — none of which bears directly on Gundersen's truthfulness, and the latest of which occurred in 2003 — was not an abuse of discretion. *See* Fed. R. Evid. 403, 609.

attempt to recall Gundersen given Atlantic's lack of a specific request to do so.

Atlantic has likewise failed to demonstrate that Judge Azrack's factual findings concerning the presence of a peril of the sea and the cause of the barge's loss were clearly erroneous. As with the related inquiry into the MIKE B's seaworthiness, Judge Azrack reasonably credited Coastal's and Sterling's experts over Atlantic's on the condition of the barge and the cause of the spud well's tearing, finding that it was the unexpected sea conditions, not any inherent fragility of the barge, that caused the losses. And Judge Azrack's decision to credit Coastal's experts on weather and sea conditions over Atlantic's, due to the superior methodology and modeling relied on by the former, was similarly well reasoned. *See Atl. Specialty Ins. Co.*, 368 F. Supp. 3d at 442–43, 447–48. Taken together, then, the evidence in the record amply supports the district court's findings that the seas reached four to six feet, that such conditions were "fortuitous" in light of the barge's deployment, and that it was these conditions that caused the loss of the

44

barge. Accordingly, we do not find the district court's conclusion that the MIKE B was lost due to a covered peril under the policy to be clearly erroneous.[21, 22]

**D.    Damages**

Atlantic's final two claims of error concern the calculation of damages undertaken by the district court. First, Atlantic contends that because the policy excludes "[a]ny liability assumed by the assured beyond that imposed by law," Joint App'x 1436 — and thus excludes third-party contractual liabilities — it should not be responsible for payments withheld under the contract between Coastal and Triton.[23]  Appellant Br. at 54–56.

---

[21] The district court found in the alternative that the loss was caused by Gundersen's negligence in failing to properly account for the weather, which would be covered by the Policy's Inchmaree ("Additional Perils") clause. *See Atl. Specialty Ins. Co.*, 368 F. Supp. 3d at 448–49.  Because we find no error with the district court's conclusion concerning the perils of the sea, we need not address this separate conclusion.

[22] Because we affirm the district court's conclusions that the policy was not void and that it covered the loss of the MIKE B, we reject Atlantic's claim for reimbursement of $238,750 it paid under a reservation of rights to a third party for removal of the MIKE B wreck.

[23] As recounted above, Triton was the prime contractor for the Steeplechase Pier project with the City of New York.  Triton subcontracted with Coastal to undertake the pier

Second, Atlantic challenges the inclusion of damages for barge salvage and pier damage that were substantiated at trial by "un-authenticated third party bills, records and unsupported summaries of sums Triton reportedly withheld under their contract." Appellant Br. at 56. We do not find either claim of error persuasive.

Regarding the claim that certain damages are not compensable under the policy by virtue of their being "contractual" in nature, Atlantic asks us to read into its policy terms that simply do not exist. The claimed damages do not arise out of a contractual dispute, but represent payments withheld specifically to compensate Triton for repairs necessitated by the MIKE B's collisions with the Steeplechase Pier. Atlantic's challenge to its liability for the repairs under the policy is, rather, a challenge to the form in which Coastal paid for the repairs, not to the fact that such repairs are covered

---

repairs. After the pier was further damaged by the MIKE B, Triton held back portions of its payments to Coastal under their subcontractor agreement to cover the costs Triton incurred to repair these further damages and to clean up related debris.

under the policy. Under Atlantic's theory, it would apparently not avoid liability if Coastal had made the repairs itself, if Triton had simply sent an invoice requesting payment for the repairs, or if Triton had sued Coastal in tort for the costs of the repairs. Because the policy makes no distinction concerning the form of payment, we cannot agree with an argument that essentially implies such a term into the policy.

Similarly, we do not find persuasive Atlantic's arguments concerning Coastal's use and the court's admission of "un-authenticated third party bills, records and unsupported summaries of sums Triton reportedly withheld under their contract" to prove damages. Appellant Br. at 56. We find no abuse of discretion by the district court in admitting and crediting the challenged evidence. That evidence is a lengthy compilation of spreadsheets and supporting invoices prepared not for trial, but by Coastal's insurance adjuster for the purposes of submitting a claim under the policy, and it was sent to Atlantic in 2014. The district court correctly concluded that Atlantic failed to raise any credible reason to suspect the

documents were inauthentic or inaccurate. Moreover, even if Atlantic had done so, the documents, "taken together with all the circumstances," have the "distinctive characteristics" of the invoices Coastal propounds they are. Fed. R. Evid. 901(b)(4). And the district court rightly concluded that Rule 1006, which requires a party to be able to produce for examination the original documents underlying a summary chart prepared for trial, was inapplicable to these documents as they were prepared not for trial, but for submission of the insurance claim in 2014.[24] *See* Fed. R. Evid. 1006. In sum, we do not find error in the district court's computation of Coastal's damages.

---

[24] We note also that Atlantic had these documents in its possession as of 2014 and thus had ample time to seek discovery concerning their accuracy. Atlantic did produce evidence of inaccuracy concerning two invoices, and the district court excluded those from its calculation. *See Atl. Specialty Ins. Co.*, 368 F. Supp. 3d at 451. Given the substantial opportunity to evaluate the other invoices, Atlantic's failure to credibly call into question any of them supports the district court's rejection of Atlantic's challenge to their authenticity.

## IV.  CONCLUSION

We have reviewed all of the remaining arguments raised by Atlantic on appeal and find them to be without merit.  For the foregoing reasons, we **AFFIRM** the judgment of the district court.